UNITED STATES of America, Plaintiff-Appellant,

v.

CURTIS–NEVADA MINES, INC., and Robert Curtis, Defendants-Appellees.

No. 76–3093.

United States Court of Appeals, Ninth Circuit.

Jan. 17, 1980.

Carl Strass, Washington, D. C., for plaintiff-appellant.

No appearance for defendants-appellees.

Before TRASK and HUG, Circuit Judges, and ORRICK *, District Judge.

HUG, Circuit Judge:

This case concerns the right of the general public to use the surface of land upon

* Hon. William H. Orrick, Jr., District Judge for the Northern District of California, sitting by designation.

which unpatented mining claims have been located, when that use does not interfere with mining activities. The principal issue is whether the owner of unpatented mining claims has the right to exclude members of the general public from such use of the surface of the land for recreational purposes or access to other public lands unless they have obtained a specific governmental permit or license for such use. To resolve this issue, we are called upon to construe the provisions of the Surface Resources and Multiple Use Act of 1955 ("Multiple Use Act"), Pub.L.No.84–167, 69 Stat. 367 (codified at 30 U.S.C. §§ 611–612).

The United States brought this action to enjoin Curtis-Nevada Mines, Inc. and its president, Robert Curtis, from prohibiting members of the public from using the surface of appellees' unpatented mining claims for recreational purposes or for entrance to adjacent National Forest lands. Since 1970, appellees located approximately 203 mining claims on public lands administered by the Bureau of Land Management under the Department of the Interior and on lands within the Toiyabe National Forest administered by the Forest Service under the Department of Agriculture. These claims cover approximately 13 square miles; 21 of the claims are in Nevada and the remainder in California. This action arose after appellees prevented members of the public from entering their unpatented mining claims and barred access to several roads which crossed their claims. Jurisdiction is based upon 28 U.S.C. §§ 1291 and 1345.

The District Court, ruling on cross motions for summary judgment, held that under section 4(b) of the Multiple Use Act, 30 U.S.C. § 612(b), the public is entitled to use the surface of unpatented mining claims for recreational purposes and for access to adjoining lands, but that this use and access is available only to those members of the public who hold specific recreation licenses or permits from a state or federal agency. *United States v. Curtis-Nevada Mines, Inc.,* 415 F.Supp. 1373 (E.D.Cal.1976). The United States appeals from the portion of the judgment that allows access to the mining claims only to those persons having specific written licenses or permits from a state or federal agency. We reverse that portion of the judgment and affirm the remainder of the judgment.

I

Curtis states that he located and filed the 203 claims after stumbling upon an outcropping of valuable minerals while on a deer hunting trip. He states that, within this 13-mile area, he has located gold, platinum, copper, silver, tungsten, pitchblend, palladium, triduim, asmium, rhodium, ruthenium, scanduim, vanduim, ytterbuim, yttrium, europium, and "all the rare earths." These minerals he maintains have a value in the trillions. The mining activity of the appellees was very limited. At the time this litigation was instituted there was only one employee, who performed chiefly caretaking duties such as watching after equipment and preventing the public from entering the claims.

Hunters, hikers, campers and other persons who had customarily used the area for recreation were excluded by the appellees. Curtis posted "no trespassing" signs on the claims and constructed barricades on the Blackwell Canyon Road and the Rickey Canyon Road, which lead up into the mountains and provide access to the Toiyabe National Forest. After receiving numerous complaints, the United States filed this action asserting the rights of the general public to the use of the surface of the mining claims. The district court heard the matter on cross motions for summary judgment and held:

> [A]ny member of the public, who possesses a license or permit from any state or federal agency which allows that person to engage in any form of recreation on public land, including National Forests, can enter onto the surface of unpatented mining claims in order to engage in that recreation, or to gain access to another area to engage in that recreation, so long as there is no interference with ongoing mining operations.

415 F.Supp. at 1378. The court denied the request of the United States that Curtis be enjoined from using guards or manned gates. The court held that Curtis can use gates or barricades if personnel are available to remove the barricades for persons requesting admittance with a proper permit.

II

Section 4(b) of the Multiple Use Act provides in pertinent part:

Rights under any mining claim hereafter located under the mining laws of the United States shall be subject, prior to issuance of patent therefor, to the right of the United States to manage and dispose of the vegetative surface resources thereof and to manage other surface resources thereof (except mineral deposits subject to location under the mining laws of the United States). Any such mining claim shall also be subject, prior to issuance of patent therefor, to the right of the United States, its permittees, and licensees, to use so much of the surface thereof as may be necessary for such purposes or for access to adjacent land: *Provided, however,* That any use of the surface of any such mining claim by the United States, its permittees or licensees, shall be such as not to endanger or materially interfere with prospecting, mining or processing operations or uses reasonably incident thereto . . . .

30 U.S.C. § 612(b).

As noted by the district court, the meaning of "other surface resources" and of "permittees and licensees" is somewhat ambiguous. The principal issues in this case are whether recreational use is embodied within the meaning of "other surface resources" and whether the phrase "permittees and licensees" includes only those members of the public who have specific written permits or licenses. We agree with the district court that administrative inter-

pretation of the language by the Solicitor's Office in the Department of Interior does not provide any clear direction in the construction of this section of the statute, 415 F.Supp. at 1378.

 We look first to the legislative history of the Act. As this court has previously noted, Congress did not intend to change the basic principles of the mining laws when it enacted the Multiple Use Act. *Converse v. Udall*, 399 F.2d 616, 617 (9th Cir. 1968), *cert. denied*, 393 U.S. 1025, 89 S.Ct. 635, 21 L.Ed.2d 569 (1969). The Multiple Use Act was corrective legislation, which attempted to clarify the law and to alleviate abuses that had occurred under the mining laws. H.R.Rep.No.730, 84th Cong., 1st Sess. 7–8, *reprinted in* [1955] 2 U.S.Code Cong. & Admin.News, pp. 2474, 2480 (hereinafter House Report 730); *Converse*, 399 F.2d at 617. The statute was designed to provide for "multiple use of the surface of the same tracts of public lands, compatible with unhampered subsurface resource development." H.R.Rep.No.730 at 8, U.S.Code Cong. & Admin.News, p. 2480; 101 Cong.Rec. 8743 (1955). The purpose of the Multiple Use Act as stated broadly in House Report 730 is:

to permit more efficient management and administration of the surface resources of the public lands by providing for multiple use of the same tracts of such lands.

. . . . .

. . . to prohibit the use of any hereafter located unpatented mining claim for any purpose other than prospecting, mining, processing, and related activities.

. . . to limit the rights of a holder of an unpatented mining claim hereafter located to the use of the surface and surface resources.

H.R.Rep.No.730 at 2, U.S.Code Cong. & Admin.News, pp. 2474–75.[1]

1. When a statute is ambiguous, reports of committees of the Congress may be used as an aid to ascertaining the purpose of Congress in passing the statute. *Comm'r v. Bilder*, 369 U.S.

499, 82 S.Ct. 881, 8 L.Ed.2d 65 (1962); *NLRB v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967). Additionally, "it is the duty of a court in construing a law to

■ This concept of multiple use of surface resources of a mining claim was not intended, however, to interfere with the historical relationship between the possessor of a mining claim and the United States.

> This language, carefully developed, emphasizes the committee's insistence that this legislation not have the effect of modifying long-standing essential rights springing from location of a mining claim. Dominant and primary use of the locations hereafter made, as in the past, would be vested first in the locator; the United States would be authorized to manage and dispose of surface resources, or to use the surface for access to adjacent lands, so long as and to the extent that these activities do not endanger or materially interfere with mining, or related operations or activities on the mining claim.

*Id.* at 10, U.S.Code Cong. & Admin.News, p. 2483.

Under the general mining law enacted in 1872,[2] individuals were encouraged to prospect, explore and develop the mineral resources of the public domain through an assurance of ultimate private ownership of the minerals and the lands so developed. The system envisaged by the mining law was that the prospector could go out into the public domain, search for minerals and upon discovery establish a claim to the lands upon which the discovery was made. This required location of the claim, which involved staking the corners of the claim, posting a notice of location thereon and complying with the state laws concerning the filing or recording of the claim in the

appropriate office. A placer mining claim cannot exceed 20 acres and a lode claim cannot be larger than 1500 feet by 600 feet (which is slightly over 20 acres). The locator thus obtained "the exclusive right of possession and enjoyment of all the surface included within the lines of their locations." 30 U.S.C. § 26.

Before the 1955 Act this exclusive possession and use was recognized so long as the use was incident to prospecting and mining. *United States v. Richardson*, 599 F.2d 290, 292–93 (9th Cir. 1979); *United States v. Nogueira*, 403 F.2d 816, 824–25 (9th Cir. 1968). The claimant thus had the present and exclusive possession for the purpose of mining, but the federal government retained fee title and could protect the land and the surface resources from trespass, waste or from uses other than those associated with mining. *Richardson*, 599 F.2d at 293. The claimant could apply for a patent to the land under 30 U.S.C. § 29, and, upon meeting the statutory requirements, would be granted a patent which usually conveyed the full fee title to the land.[3]

In order to obtain the patent the claimant would have to establish that there was a legitimate discovery of a valuable mineral deposit on the land which a prudent man would be justified in developing.[4] In many instances an investigation and hearing would be required prior to granting a patent. However, claimants could continue mining activities on the claims, without ever obtaining a patent. As a practical matter, mining claimants could remain in exclusive possession of the claim without

---

consider the circumstances under which it was passed and the object to be accomplished by it." *United States v. Anderson*, 76 U.S. (9 Wall.) 56, 65–6, 19 L.Ed. 615 (1869).

**2.** Provisions derived from the general mining law of 1872 are now codified within Title 30, c. 2 (30 U.S.C. §§ 21–54).

**3.** A patent may convey less than the full fee title by reservations made in the patent or provided by law.

**4.** In order to establish a valid discovery the "prudent man" test is used. The test as frequently stated is:

Where minerals have been found, and the evidence is of such a character that a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine, the requirements of the statute have been met. *Converse*, 399 F.2d at 619 (quoting *Castle v. Womble*, 19 L.D. 455, 457 (1894). This prudent man test has been further modified to require a showing that the mineral can be extracted, removed and marketed at a profit. *Converse*, 399 F.2d at 621.

ever proving a valid discovery or actually conducting mining operations. This led to abuses of the mining laws when mining claims were located with no real intent to prospect or mine but rather to gain possession of the surface resources. Furthermore, even persons who did have the legitimate intent to utilize the claim for the development of the mineral content at the time of the location often did not proceed to do so, and thus large areas of the public domain were withdrawn, and as a result these surface resources could not be utilized by the general public for other purposes.

It was to correct this deficiency in the mining law that Congress in 1955 enacted the Multiple Use Act. Some of the abuses and problems that the legislation was designed to correct are detailed in House Report 730:

> The mining laws are sometimes used to obtain claim or title to valuable timber actually located within the claim boundaries. Frequently, whether or not the locator so intends, such claims have the effect of blocking access-road development to adjacent tracts of merchantable Federal timber, or to generally increase costs of administration and management of adjacent lands. The fraudulent locator in national forests, in addition to obstructing orderly management and the competitive sale of timber, obtains for himself high-value, publicly owned, surface resources bearing no relationship to legitimate mining activity.

> Mining locations made under existing law may, and do, whether by accident or design, frequently block access: to water needed in grazing use of the national forests or other public lands; to valuable recreational areas; to agents of the Federal Government desiring to reach adjacent lands for purposes of managing wild-game habitat or improving fishing streams so as to thwart the public harvest and proper management of fish and game resources on the public lands generally, both on the located lands and on adjacent lands.

. . . . . .

Under existing law, fishing and mining have sometimes been combined in another form of nonconforming use of the public lands: a group of fisherman-prospectors will locate a good stream, stake out successive mining claims flanking the stream, post their mining claims with "No trespassing" signs, and proceed to enjoy their own private fishing camp. So too, with hunter-prospectors, except that their blocked-out "mining claims" embrace wildlife habitats; posted, they constitute excellent hunting camps.

The effect of nonmining activity under color of existing mining law should be clear to all: a waste of valuable resources of the surface on lands embraced within claims which might satisfy the basic requirement of mineral discovery, but which were, in fact, made for a purpose other than mining; for lands adjacent to such locations, timber, water, forage, fish and wildlife, and recreational values wasted or destroyed because of increased cost of management, difficulty of administration, or inaccessibility; the activities of a relatively few pseudominers reflecting unfairly on the legitimate mining industry.

H.R.Rep.No.730 at 6, U.S.Code Cong. & Admin.News, pp. 2478–79. House Report 730 further points out that one of the ways to combat these abuses would be to step up federal government action to contest location of claims:

> If fraudulent locations are made, under present law the United States has the right to refuse patents (if application is made), or to attack such locations in court.

> Modification of presently authorized administrative action alone does not appear the answer. Presently available remedies are time-consuming, are costly, and, in the end, not conclusive. Where a location is based on discovery, it is extremely difficult to establish invalidity on an assertion by the United States that the location was, in fact, made for a purpose other than mining.

If locations must be proven fraudulent in court before dispossession, the mining laws must be so drawn or so framed as to make clear to locators what can and what cannot be done. On the other hand, continual interference by Federal agencies in an effort to overcome this difficulty would hamper and discourage the development of our mineral resources, development which has been encouraged and promoted by Federal mining law since shortly after 1800.

*Id.* at 7, U.S.Code Cong. & Admin.News, p. 2479.

The alternative chosen by Congress was to limit the exclusive possession of mining claimants so as to permit the multiple use of the surface resources of the claims prior to the patenting of the claims, so long as that use did not materially interfere with prospecting or mining operations.

In the district court proceedings Curtis asserted that recreational uses are not encompassed within the meaning of "other surface resources" in § 612(b). However, as the district court properly held, the phrase "other surface resources" was clearly intended to include recreational uses. It is apparent from the previously quoted portions of House Report 730 at 6, as well as committee hearings cited by the district court, 415 F.Supp. at 1378, that recreation was one of the "other surface resources" to which 30 U.S.C. § 612(b) refers. This conclusion is further buttressed by the Bureau of Land Management regulations implementing the Multiple Use Act.[5] It is therefore a surface resource that the United States has a right to manage and that the

United States and its permittees and licensees have a right to use so long as the use does not "endanger or materially interfere with prospecting, mining or processing operations or uses reasonably incident thereto." 30 U.S.C. § 612(b).

The remaining question that the district court addressed concerns the identification of the "permittees and licensees" of the United States entitled to use the surface resources. The district court held that the "permittees and licensees" are only those who have specific written permits or licenses from any state or federal agency allowing those persons to engage in any form of recreation on public land. The court mentions hunting, fishing or camping permits as illustrative of the required permits. It is at this point that we disagree with the district court.

Historically the United States has managed the lands within the public domain as fee owner and trustee for the people of the United States. *Light v. United States,* 220 U.S. 523, 527, 31 S.Ct. 485, 55 L.Ed. 570 (1911); *Camfield v. United States,* 167 U.S. 518, 524, 17 S.Ct. 864, 42 L.Ed. 260 (1897). Also, in the management of public lands, the United States has historically allowed the general public to use the public domain for recreation and other purposes, and often without a specific, formal permit. Such access has been described as an implied license.

Originally, grazing of livestock was such a use that was allowed without a formal

---

5. 43 C.F.R. § 3712.1(b) provides:

The locator of an unpatented mining claim subject to the act is limited in his use of the claim to those uses specified in the act, namely prospecting, mining, or processing operations and uses reasonably incident thereto. He is forbidden to use it for any other purpose such, for example, as for filling stations, curio shops, cafes, tourist, or fishing and hunting camps. Except as such interference may result from uses permitted under the act, the locator of an unpatented mining claim subject to the act may not interfere with the right of the United States to manage the vegetative and other surface resources of the land, or use it so as to block access to or egress from adjacent public land, or use Federal timber for purposes other than those permitted under the act, or block access to water needed in grazing use of the national forests or other public lands, or block access to recreational areas, or prevent agents of the Federal Government from crossing the locator's claim in order to reach adjacent land for purposes of managing wild-game habitat or improving fishing streams so as to thwart the public harvest and proper management of fish and game resources on the public lands generally, both on located and on adjacent lands.

permit.[6] In *Buford v. Houtz,* 133 U.S. 320, 10 S.Ct. 305, 33 L.Ed. 618 (1890), the Supreme Court found an implied license to graze livestock on the public lands and acquiescence in the practice by the government as proprietor of the public lands:

> We are of opinion that there is an implied license, growing out of the custom of nearly a hundred years, that the public lands of the United States . . shall be free to the people who seek to use them where they are left open and unenclosed, and no act of government forbids this use. . . . The government of the United States, in all its branches, has known of this use, has never forbidden it, nor taken any steps to arrest it.

*Id.* at 326, 10 S.Ct. at 307.

This principle of an implied license of the public to use lands within the public domain freely without a formal license was again reaffirmed by the court in *Light v. United States*:

> At common law the owner was required to confine his livestock, or else was held liable for any damage done by them upon the land of third persons. That law was not adapted to the situation of those states where there were great plains and vast tracts of unenclosed land, suitable for pasture. And so, without passing a statute, or taking any affirmative action on the subject, the United States suffered its public domain to be used for such purposes. There thus grew up a sort of implied license that these lands, thus left open, might be used so long as the Government did not cancel its tacit consent.

220 U.S. at 535, 31 S.Ct. at 487.

In *McKee v. Gratz,* 260 U.S. 127, 43 S.Ct. 16, 67 L.Ed. 167 (1922), the Court applied this concept of an implied license to include a license to use large tracts of uncultivated lands for recreational uses. Mr. Justice Holmes in the opinion of the Court stated:

> The strict rule of the English common law as to entry upon a close must be taken to be mitigated by common understanding with regard to the large expanses of unenclosed and uncultivated land in many parts at least of this country. Over these it is customary to wander, shoot and fish at will until the owner sees fit to prohibit it. A license may be implied from the habits of the country.

*Id.* at 136, 43 S.Ct. at 17.

The historical principle that no formal permission, permit, or license is required for use of public lands for general recreational use or access to adjoining lands was formalized by the Forest Service with regard to National Forests in 1942 when it enacted a regulation which states in pertinent part:

> The temporary use or occupancy of national forest lands by individuals for camping, picnicking, hiking, fishing, hunting, riding, boating, parking of vehicles and similar purposes may be allowed without a special use permit; provided . . . that permits may be required for such uses when in the judgment of the Chief of the Forest Service the public interest or the protection of such lands requires the issuance of permits.

36 CFR § 251.1(a)(2) (1979).

A similar policy of holding public lands open for recreational use has been followed by the Bureau of Land Management in its administration of the 457 million acres of public lands not set aside for national forests, parks or other special uses. Bureau of Land Management, U.S. Department of the Interior, *Camping on the Public Lands; see also* Forest Service, U.S. Dept. of Agriculture Information Bulletin No. 301, *Outdoor Recreation In the National Forests* 11 (1965).

These regulations confirm a traditional policy for the use of public lands allowing the public to use lands within the public domain for general recreational purposes without holding a written, formal permit, except as to activities which have been specifically regulated.

---

6. The federal government has since established grazing districts and requires specific grazing permits. *See* 43 U.S.C. §§ 315–316*o.*

The Multiple Use Act was designed to open up the public domain to greater, more varied uses. To require that anyone desiring to use claimed lands for recreation must obtain a formal, written license would greatly restrict and inhibit the use of a major portion of the public domain.[7] It is doubtful that Congress would intend that such use be dependent upon a formal permit, because the federal agencies do not generally issue or require permits for recreational use of public lands. To require a formal written permit would either put the public in a position of having to obtain permits but having no place from which to obtain them, or it would require the government to institute procedures to issue permits, a process which the government argues is burdensome and unnecessary.

One of the clear purposes of the 1955 legislation was to prevent the withdrawal of surface resources from other public use merely by locating a mining claim. The inertia of the situation was previously with the mining claimant who retained exclusive possession of the surface of the claim until the location was invalidated by affirmative action. As to claims located after the 1955 legislation, however, the inertia works the other way. Essentially, the surface resources remain in the public domain for use as before with the exception that the mining claimant is entitled to use the surface resources for prospecting and mining purposes and that the other uses by the general public cannot materially interfere with the prospecting and mining operation. Thus,

the vast acreage upon which mining claims have been located since 1955 or claims which, by operation of the statute, have become subject to the provisions of section 612(b), remain open for public use except for the restrictions imposed where actual mining or prospecting operations are taking place.[8]

The district judge's conclusion that the "permittees and licensees" designated in section 612(b) are only those possessing written permits from a state or federal agency appears to be based largely upon a question and subsequent statement of Senator Bible at the committee hearing. *See Curtis,* 415 F.Supp. at 1378. The Senator asked whether a fisherman with a fishing license issued by either a state or federal agency could enter an unpatented mining claim that had a "No Trespassing" sign on it. He then stated:

"The only purpose of my question was to determine . . . if . . . Section 4 did permit the fisherman to go to the stream under those circumstances. *I understand [the] answer to be yes."*

*Id.* Our review of the hearing and the statement of Senator Bible leads us to the conclusion that the question and statement were illustrative and was intended to confirm the right of a member of the general public to utilize the "other surface resources" of an unpatented mining claim for recreation. Senator Bible's question was not addressed to what requisites were necessary to constitute a "permittee," but rath-

---

7. A report from the Department of Agriculture, to the House Committee on Interior and Insular Affairs concerning the proposed legislation stated that as of January 1, 1952 there were 84,000 unpatented claims, covering 2.2 million acres of national forest but only 2% of these mines were producing minerals in commercial quantities and probably no more than 40% could be considered valid. As of January 1, 1955 there were an estimated 166,000 claims covering 4 million acres. H.R.Rep.730, 84th Cong., 1st Sess., *reprinted in* [1955] 2 U.S.Code Cong. & Admin.News, pp. 2474, 2492–93.

8. Section 5 of the Multiple Use Act, 30 U.S.C. § 613 provides an in rem procedure to identify

which patented claims will be subject to the provisions of § 612. Briefly stated § 613 provides that the federal agency having responsibility for administering the surface resources may publish a notice requiring claimants to file within 150 days a verified statement concerning their mining claims. Failure to file the statement constitutes a waiver of any rights in the claims that are contrary to the limitations of § 612. The failure to file does not, however, affect the validity of the claim itself but only subjects the claim to the limitations of § 612. Thus, a claim located prior to 1955 may, by this procedure, become subject to the limitations of § 612.

er to assure that recreational uses would be allowed on unpatented mining claims.[9]

Consequently, in light of the historical background of the use of the public domain for many purposes without express written permits or licenses we do not find in the legislative history of the 1955 act an intent to so limit the meaning of "permittees and licensees." Most assuredly, the B.L.M. or the Forest Service can require permits for public use of federal lands in their management of federal lands; however, they need not do so as a prerequisite to public use of surface resources of unpatented mining claims.

It should be noted that mining claimants have at least two remedies in the event that public use interferes with prospecting or mining activities. Section 612(b) provides that "any use of the surface . . . shall be such as not to endanger or materially interfere with prospecting, mining or processing operations or uses reasonably incident thereto." The mining claimant can protest to the managing federal agency about public use which results in material interference and, if unsatisfied, can bring suit to enjoin the activity. Secondly, a claimant with a valid claim can apply for a patent which, when granted, would convey fee title to the property.

In the present case, appellees have not presented any evidence that the public use of land included within their unpatented mining claim has "materially interfered" with any mining activity. Absent such evidence, section 612(b) applies in this case to afford the general public a right of free access to the land on which the mining claims have been located for recreational use of the surface resources and for access to adjoining property. Therefore, we reverse the portion of the judgment that requires specific written permits or licenses for entry onto the mining claims, and we

remand this case to the district court for entry of an injunction consistent with the views expressed in this opinion.

---

9. The conclusion of the district court that a *state* license would be sufficient to permit access to the claim appears inconsistent with a conclusion that express permission must be obtained from the federal government. Senator Bible's illustration of a fisherman who had a *state* fishing license would appear to confirm our conclusion that the general implied license to use the federal lands was sufficient, because a state fishing license would not constitute an express permit or license from the federal government.