**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Ray SHUMWAY; Molly Shumway,**
**Defendants–Appellants.**

**No. 96–16480.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 12, 1997.

Filed Dec. 28, 1999.

---

Arthur E. Lloyd, Payson, Arizona, for the defendants-appellants.

Robert Bartels, Assistant United States Attorney, Phoenix, Arizona, for the plaintiff-appellee.

Before: SNEED and KLEINFELD, Circuit Judges, and WALLACH, Judge.[1]

Opinion by Judge KLEINFELD; Concurrence by Judge WALLACH.

KLEINFELD, Circuit Judge:

This is a mining law case. Issues arise regarding the extent to which the owner of an unpatented mining claim or mill site has surface rights despite the absence of approval of his operating plan or bond, and also the constraints on disapproval.

## Facts

Ray and Molly Shumway own seven mill sites in the Tonto National Forest in Arizona. Two of the seven mill sites, BLM claim numbers AMC 203225 and 209240, are the subject of this lawsuit. The mill sites were held pursuant to mill site claims. Mining claims and mill site claims, in mining law terminology, are vested possessory rights which are recognized as interests in real property; they are not merely assertions of rights, as claims are in the more common sense of the word. Because this case was decided on summary judgment, the facts, where disputed, are taken most favorably to the Shumways based on the cognizable evidence submitted on the summary judgment motions.[2]

The mill sites are subject to Forest Service operating plan approval because they are in a national forest.[3] Approvals of the Shumways' plans of operations have been repeatedly granted. The first approval in the record was in 1979, for 1979–80. In its 1981 approval, the Forest Service approved a cyanide leaching operation on the

1. The Honorable Evan J. Wallach, Judge of the United States Court of International Trade, sitting by designation.

2. See Berry v. Valence Tech., Inc., 175 F.3d 699, 703 (9th Cir.1999).

3. See 36 C.F.R. 228.4 (1998).

sites (cyanide combines usefully with gold and silver, so is used extensively to extract those valuable metals from their ores). The Forest Service required the Shumways to have someone live on site to discourage vandalism.

Friction appears to have begun between the Shumways and the Forest Service in the late 1980s. Mr. Shumway states in his affidavit that a Mr. Rodney Byers of the Forest Service came to the district and told him that he "would try to figure out a way to get me off of" his claims before patents for which Mr. Shumway had applied were issued. In 1987, the Forest Service directed Shumway to stop stabling a horse on the property, and clean up trash and junk. But Mr. Shumway felt he needed the horse to inspect the perimeter of his mill sites and to inspect mines in the forest, because no motor vehicles were allowed. Mr. Shumway states in his affidavit that "[a]ll of the equipment and materials stored on the mill sites have been or were incidental to the milling operations." That same year, the Forest Service ordered the Shumways out of their home in a travel trailer on one of the sites, though in 1981 it had required that someone live there to guard against the risk of vandalism. No more cyanide leaching was taking place by then, which had been the Forest Service's stated reason for requiring residence on the site, but other chemicals were being used.

The Forest Service also changed its bond requirements with respect to the Shumway mill sites. The operating plan approved in 1979 required the Shumways to post a $2,000 cash or surety bond to assure eventual reclamation of the disturbed area. In 1980, the Forest Service increased the required performance bond to $3,200. The $3,200 amount was approved again in 1981. By 1990, the bond amount had crept up to $5,200, although less ore was being processed than in the 1980s and no cyanide leaching was taking

place. But in 1990, the Forest Service raised the required bond to $18,000.

The Shumways submitted a corporate surety bond, adequate in amount, from Globe Insurance Company, Ltd., but the Forest Service rejected the bond because Globe was not listed by the Department of the Treasury as an accepted surety. The Shumways unsuccessfully appealed the increase in the bond requirement and were unable to post it. They found that no sureties on the Department's approved list were writing such bonds, and they did not have $18,000 cash they could spare from the milling operations. In 1991, the Forest Service ordered them to stop all milling and mining and leave their residence on the mill site, because they had not posted the bond. The Forest Service subsequently advised the Shumways that if they tried to obtain approval for a new operating plan, they could expect the bond to be raised to $150,000 or $200,000.

Meanwhile, the Shumways, in 1994, applied for patents to their mill sites. A "patent" "is the conveyance by which the [federal government] passes its title to portions of the public domain."[4] A patent does not merely pass title, like a deed, but operates as an official declaration of title which is, with limited exceptions, unassailable and not rebuttable.[5] The Shumways duly recorded, posted, and published notice. The Secretary of the Interior had, in 1993, revoked his delegation of authority to the Bureau of Land Management to sign the critical document preceding a patent, the "First Half of the Mineral Entry Final Certificate," so the Shumways' papers were forwarded to the Secretary himself. On December 1, 1994, the Secretary of the Interior personally signed the First Half–Mineral Entry Final Certificate for the mill sites at issue and five other Shumway claims.

4. *Smelting Co. v. Kemp,* 104 U.S. 636, 640, 26 L.Ed. 875 (1881).

5. *Id.* at 640–41.

The Department then advised the Shumways that a patent would issue "if all is found regular and upon demonstration and verification of use and/or occupancy." This would be verified "by a mineral examiner in an on-the-ground examination." But the Shumways' case file was not assigned by the Department to a mineral examiner. As of the summer of 1995, the Arizona BLM was proceeding with only two field examinations, and those had been requested seven and eight years before. There were eleven more to go before the BLM got to the Shumways' field examination.

In 1995, the United States sued the Shumways to evict them from the two mill sites, and require them to remove all their things and clean the sites up. The Complaint alleges that the Shumways were not conducting any milling at the mill sites, had no approved plan of operations, had failed to post the required bond, and were trespassing. The district court granted summary judgment in favor of the government, ordering the Shumways to remove themselves and all their things from the sites and to restore the sites to their natural condition, or if they did not, they would forfeit the sites and be required to pay damages sufficient to restore the sites. The Shumways appeal.

## Background

It is hard to understand this dispute about a relatively arcane area of law without reference to history. During the first half of the nineteenth century, the United States established a mineral leasing system, so that the government would realize much of the economic benefit of minerals found on public lands. But President Polk reported to Congress in 1845 that the cost of government administration was more than four times the lease income, and the leasing system was abandoned.[6] The California gold rush in 1849 took place without much law to guide it, so the miners developed their own rules and customs. They evolved in the miners' meetings, which were used to govern mining camps before any official government existed at these remote locations. Among the earliest successful prospectors in the 1849 California gold rush were experienced miners from Cornwall, England, Chile, participants in the Dahlonega, Georgia gold rush of 1829, and other experienced prospectors and miners, who already knew something about what practical rules were needed.[7] That the rules were so successful may reflect this combination of practical experience with considerable learning, for "[i]n 1849 hardly a camp existed on the great Sierra slope that did not contain miners who were graduates of colleges and law-schools or were lawyers of considerable experience."[8]

The miners' meetings operated as might be expected of a highly democratic process. They favored the interests of those who were there-mostly individuals and small firms without much capital. A much more centralized governmental process in Washington might have favored those with influence in the national government-perhaps those who might want to maximize federal revenue, preserve federal lands, or protect large firms from having to pay huge amounts to buy claims from small scale prospectors who discovered minerals but lacked the capital to extract them.

Other approaches were possible, and might have commended themselves to people with different interests. Justice Field took the position, to the great displeasure of the miners, that under the common law after Alta California became American,

**6.** *See* John C. Lacy, *Historical Overview of the Mining Law: The Miners' Law Becomes Law,* in *The Mining Law of 1872: A Legal and Historical Analysis* 16–17 (1989).

**7.** *See* Charles Howard Shinn, *Mining Camps—A Study in American Frontier Govern-* ment 38–39 (Knopf ed.1948) (1885); *see also* Charles Wallace Miller, Jr., *Stake Your Claim!: The Tale of America's Enduring Mining Laws* 16–17 (1991).

**8.** Shinn, *supra* note 14, at 168.

minerals passed to the owner of the land, so that the miner could not invade land privately held.[9] Another alternative might have been the Mexican, based on the Spanish custom, whereby the sovereign was entitled to a royal share, or royalty, of one fifth of the gold.[10] Yet another approach might be the English, where unlike the Spanish *quinto*, if any gold or silver was found in a mine the king was entitled to the whole, at least if the precious metals were worth more than the base metals (though by two statutes of William and Mary, the king allowed the owner to keep the mine provided that the gold and silver must be sold to the king for the value of the tin in the ore).[11] In the American gold rushes in the West, the miners made the rules, so the miners made the money. This stimulated a great deal of successful mining.

Even though most of the gold in the California and other western gold rushes was found on federal land, the federal government adopted a mining law scheme late, long after the customs of ownership by discovery and extraction had been established. The California gold rush of 1849, Colorado in 1859, the Comstock Lode and other strikes in Nevada in 1859–60, Idaho in 1862–63, Montana in 1863, and quite a few others, all preceded the federal mining laws. As in the software industry in the 1990s, the industry developed, many vast individual fortunes were made, and the national wealth was greatly increased, all by a new kind of property, before much

of the legal framework for the industry developed.

When it came, in skeletal form in 1866, and in substantially its current form in the Mining Law of 1872, the federal statutory law of mining "received" customary law in much the same way that the states had received the common law. The statute, still in force, says "all valuable mineral deposits" in federal lands "shall be free and open to exploration and purchase" under prescribed regulations "and according to the local customs or rules of miners in the several mining districts, so far as the same are applicable and not inconsistent with the laws of the United States." [12] Thus, instead of following any of the alternative schemes, which might have preserved more government authority or revenue, Congress expressly adopted the "local customs or rules of the miners." The most important of those customs created a property right based on discovery and extraction of valuable minerals, in the absence of any title. Thus, the history of mining customs has unusual relevance because in this area, as Faulkner said, "the past isn't dead-it isn't even past."

Despite much contemporary hostility to the Mining Law of 1872 and high level political pressure by influential individuals and organizations for its repeal, all repeal efforts have failed, and it remains the law.[13] The miners' custom, that the finder

9. Stephen J. Field, *The Annoyances of My Judicial Life* 135 *in Personal Reminiscences of Early Days in California* (1893 2d ed.) (1877).

10. Miller, *supra* note 14, at 2–3.

11. 1 William Blackstone, *Commentaries on the Laws of England* 284–85 (1765).

12. 30 U.S.C. § 22 (1994). *Cf.* Alaska Stat. § 01.10.010 (Lexis 1998) ("So much of the common law not inconsistent with the Constitution of the State of Alaska or the Constitution of the United States or with any law passed by the legislature of the State of Alaska is the rule of decision in this state."); Cal. Civ.Code § 22.2 (West 1982) ("The common law of England, so far as it is not repugnant

to or inconsistent with the Constitution of the United States, or the Constitution or laws of this State, is the rule of decision in all the courts of this State.").

13. *See, e.g.,* Sen. Dale Bumpers, *Reform of the 1872 Mining Law, in The Mining Law of 1872: a Legal and Historical Analysis* 7 (1989); Associated Press, *Babbitt Calls Mining Law "Outrageous Gift,"* The Denver Post, May 15, 1997, at B8; Miller, *supra* note 14, at 238–246 (stating that environmental organizations and large mining companies have favored replacement of Mining Law of 1872 with leasing scheme, but the "little man" has so far succeeded in mobilizing sufficient political strength to prevent change).

of valuable minerals on government land is entitled to exclusive possession of the land for purposes of mining and to all the minerals he extracts, has been a powerful engine driving exploration and extraction of valuable minerals, and has been the law of the United States since 1866. Mill site claims, which are ancillary to mining because grinding the ore is often necessary to extracting the valuable minerals, follow substantially the same rules as mining claims.[14]

■ "A mineral claim is a parcel of land containing precious metal in its soil or rock." [15] Under the Mining Law of 1872, there are three stages in patenting a mining claim. The first stage is "location" of a claim. "A location is the act of appropriating such a parcel," [16] generally by posting notice on the ground. "The locators of all mining locations . . . so long as they comply with the laws . . . shall have the exclusive right of possession and enjoyment of all the surface located within the lines of their locations, and of all veins, [and] lodes . . . ." [17]

At the second stage, the prospector is required to perform improvements or assessment work. "[U]ntil a patent has been issued therefor, not less than $100 worth of labor shall be performed or improvements made during each year." [18] Third, the prospector may apply for a patent. A person who has "located" a mining or mill site claim can apply for a patent (the term for a government conveyance of title to an individual of public land) with the Bureau of Land Management, show compliance with the laws regarding location, post no-

tice of application, and file proof of notice.[19] After further publication of notice, the applicant files papers showing that the requisite labor has been expended on the claim and that the description is correct, and further proof of the requisite publication of notice.[20] At that point, if no adverse claim has been filed, "it shall be assumed that the applicant is entitled to a patent" upon payment of a nominal fee, unless it is shown that the applicant has failed to comply with the mining laws.[21] A mill site is patented the same way.[22]

As the Bureau of Land Management's 1991 internal manual explains the mill site procedure, "mill sites must be used or occupied for mining and milling purposes only, or uses reasonably in support of mining and milling purposes as commonly recognized in the mining industry." [23] The manual says that issuance of the "First Half of the Final Certificate," such as the Shumways obtained, "confirms equitable title is vested in the applicant, subject to the confirmation of a discovery of a valuable mineral deposit by a mineral examiner," [24] certifies that the applicant "has satisfactorily complied with all 'paperwork requirements'," and "eliminates the need for performance of assessment work." [25]

■ In ordinary English, a "claim" is merely a demand for something, or an assertion of a right where the right has not been established. The phrase "mining claim" therefore probably connotes to most laymen an unsupported assertion or demand from which no legal rights can be inferred. But that is emphatically not so. In law, the word "claim" in connection with

14. *See* 30 U.S.C. 42(a) (1994).

15. *St. Louis Smelting & Ref. Co. v. Kemp,* 104 U.S. 636, 649, 26 L.Ed. 875 (1881).

16. *Id.*

17. 30 U.S.C. § 26.

18. 30 U.S.C. § 28.

19. 30 U.S.C. § 29.

20. *Id.*

21. *Id.*

22. *See* 30 U.S.C. § 42(a).

23. BLM Manual, release 3–270, Millsite Claim Patent Applications § 3864.1(F).

24. *Id.* at ch. 6(A)(2).

25. *Id.*

the phrase "mining claim" represents a federally recognized right in real property. The Supreme Court has established that a mining "claim" is not a claim in the ordinary sense of the word-a mere assertion of a right-but rather is a property interest, which is itself real property in every sense, and not merely an assertion of a right to property. *Benson Mining & Smelting Co. v. Alta Mining & Smelting Co.*[26] held that once the owners of a mining claim applied for a patent and paid the fees, and the right to a patent existed, they had "full equitable title,"[27] and their failure to do subsequent annual work on the claim did not reopen it to subsequent location by another. "[O]nly the naked legal title remains in the government, in trust for the [applicant], in whom are vested all the rights and obligations of ownership."[28]

The question in *Bradford v. Morrison*[29] was whether unpatented mining claims are real property. The Court held that the unpatented "title of a locator" is "property in the fullest sense of the word," noting that unpatented mining claims, at that time, "constitute[d] very largely the wealth of the Pacific Coast states."[30] In *United States v. North American Transportation & Trading Co.*,[31] the Army had been sent to Nome to bring order during its gold rush, and the president established a federal reservation for the Army base. The Court, in an opinion by Justice Brandeis, held that a company holding a mining claim at the site was entitled to compensation for the taking, with interest from the date of the reservation.[32] This case establishes that the government cannot reserve its own land from an unpatented mining claim without paying the owner the value of the claim, because an unpatented mining claim is property.

In 1920, oil, oil shale, gas and certain other minerals were carved out of the Mining Law of 1872 and subjected to a federal leasing system, with a saving clause protecting "valid claims existent [at the date of the passage of the Act]."[33] *Wilbur v. United States ex rel. Krushnic*[34] involved a dispute between the Department of the Interior and persons who had located a placer claim to oil shale before the new mineral leasing act. After the new leasing law had gone into effect, the locators completed the required annual labor and applied for a patent.[35] Like Mr. and Mrs. Shumway, they received what is now called the First Half Final Certificate.[36] The Department refused to issue a patent because the annual assessment work had not been done during one of the necessary years, and was resumed only after the new statute made oil shale placer claims unavailable for patent.[37]

The Court ordered issuance of a writ of mandamus anyway, holding that failure to perform the assessment work did not "forfeit" the claim, but only subjected it to the risk that someone would locate over it, a risk averted when the original locator resumed work.[38] This decision probably had much to do with the mining industry cus-

---

26. *Benson Mining & Smelting Co. v. Alta Mining & Smelting Co.*, 145 U.S. 428, 12 S.Ct. 877, 36 L.Ed. 762 (1892).

27. *Id.* at 434, 12 S.Ct. 877.

28. *Id.* at 432, 12 S.Ct. 877.

29. *Bradford v. Morrison*, 212 U.S. 389, 29 S.Ct. 349, 53 L.Ed. 564 (1909).

30. *Id.* at 394, 29 S.Ct. 349.

31. *United States v. North Amer. Transp. & Trading Co.*, 253 U.S. 330, 40 S.Ct. 518, 64 L.Ed. 935 (1920).

32. *See id.* at 337–38, 40 S.Ct. 518.

33. 30 U.S.C. § 193.

34. *Wilbur v. United States ex rel. Krushnic*, 280 U.S. 306, 50 S.Ct. 103, 74 L.Ed. 445 (1930).

35. *See id.* at 315, 50 S.Ct. 103.

36. *See id.*

37. *See id.*

38. *See id.* at 317, 50 S.Ct. 103.

tom of operating on the basis of claims without obtaining patents, because it rendered patents (and the mineral examiners', surveyors', lawyers', and other fees to obtain them) unnecessary. "[W]hen the location of a mining claim is perfected under the law, it has the effect of a grant by the United States of the right of present and exclusive possession. The claim is property in the fullest sense of that term...."[39] The Court held that the owner of a perfected mining claim "is not required ... to secure patent from the United States; so long as he complies with all provisions of the mining laws, his possessory right, for all practical purposes of ownership, is as good as though secured by patent."[40]

In 1955, Congress dealt with the problem of sham mining claims used for other purposes. Sham claims could be used for selling timber from national forests, or obtaining free residential or agricultural land; one decision has suggested sham use of mining claims along streams by non-serious prospectors (but serious fishermen) "to enjoy their own private fishing camp."[41] The Multiple Use Act provides that "a mining claim shall not be used, prior to issuance of patent therefor, for any purposes other than prospecting, mining or processing operations and uses reasonably incident thereto."[42] Mining claims located after the effective date of the 1955 Act are subject, prior to issuance of patent, to a right of the United States to manage surface resources and for the government and whomever it permits to do so to use the surface, so long as they do not endanger or materially interfere with pros-

pecting, mining, or processing.[43] Pursuant to that statute, we held that where mining activity was limited to a caretaker watching after equipment, the government could permit public recreational use of roads crossing unpatented mining claims.[44]

We considered an action by the government for trespass and an injunction, like the one in the case at bar, in *United States v. Goldfield Deep Mines Co.*[45] The government prevailed, the company having damaged national forest land extensively without filing a plan of operations.[46] But the case differed from the case at bar in a critical respect: there had already been an administrative adjudication that Goldfield had no valid mining claim, because there were no significant minerals.[47] The claim was a sham. In the case at bar, there has been no determination of whether prudent persons would establish a mill site in the Shumways' location. The record in this case does not permit summary judgment on the basis that the claims are a sham.

In *Swanson v. Babbitt*,[48] Congress had passed a law prohibiting issuance of new patents to mining claims in the Sawtooth National Recreation Area. The appellants, who had applied prior to the new act for patents to several mining and mill site claims, challenged the law as unconstitutional, on the ground that his right to a patent had already vested. We noted that "an unpatented mining claim remains a fully recognized possessory interest,"[49] and that "[f]ederal mining claims are 'private property' which enjoy the full protection of the Fifth Amendment."[50] But in

**39.** *Id.* at 316, 50 S.Ct. 103.

**40.** *Id.* at 317, 50 S.Ct. 103.

**41.** *United States v. Curtis Nevada Mines, Inc.,* 611 F.2d 1277, 1282 (9th Cir.1980).

**42.** 30 U.S.C. § 612(a).

**43.** *See* 30 U.S.C. § 612(b).

**44.** *See Curtis–Nevada Mines,* 611 F.2d at 1284.

**45.** *United States v. Goldfield Deep Mines Co.,* 644 F.2d 1307 (9th Cir.1981).

**46.** *See id.* at 1308.

**47.** *Id.* at 1308 n. 2.

**48.** *Swanson v. Babbitt,* 3 F.3d 1348 (9th Cir. 1993).

**49.** *Id.* at 1350.

**50.** *Id.* at 1353.

*Swanson* (unlike the Shumways' case) the Bureau of Land Management had challenged the validity and scope of the claims, and we noted that for patent rights to vest upon application, the application had to be valid, and no right arose from an invalid claim.[51] As long as the claimant had complied with applicable claims laws until filing, failure to adhere to regulations after filing could not invalidate his claim, but where the Secretary contested the claim in good faith and not for purposes of delay, then the delay was not merely ministerial but resulted from the challenge, and the right to a patent did not vest until resolution of the challenge, which came after the effective date of the Act.[52] Under *Swanson*, a mining claimant may be without a right to receive a patent if there is a good faith dispute as to its validity though he would have a vested right if the only reason he has not received his patent is administrative delay by the Secretary.

## Analysis

The Shumways argue that their equitable title in the mill site claims entitles them not to be treated as trespassers, the increase in their bond requirement to $18,000 and then at least $150,000 if they were to get approval of a new operating plan was impermissible, and that the district court improperly rejected their evidence on summary judgment. We review *de novo* because the case was decided on summary judgment.[53]

### I.

 The Shumways argue that because they had received the First Half Final Certificate toward their patent, they had equitable title to the real estate inconsistent with the district court determination that they were trespassers. The government argues that issuance of the First Half Final Certificate established only that the Shumways had filed their papers applying for a patent, not that they were entitled to a patent or possession. To decide the case, it is necessary to figure out just what the Shumways owned.

The Shumways argue that their right to a patent has vested, because they have done all that they are obligated to do in order to receive one, and the delay in issuance is attributable merely to administrative delay. In this argument, they are incorrect. There is a presumption that they are entitled to a patent, because, as explained above, the statute provides that "it shall be assumed"[54] that they are entitled to a patent now that the First Half of the Final Certificate has been issued. But the presumption is rebuttable, as the statute provides in the phrase "unless it is shown that the applicant has failed to comply with the mining laws."[55] If the Shumways were entitled to a patent at the time they applied, then it is true that as of that time they have had "full equitable title" with the government retaining "only the naked legal title" in trust for them and subject to their fully vested rights and obligations of ownership.[56] But that is true only if the right to a patent existed. Were the Secretary to have challenged, in good faith, the Shumways' compliance with the mining laws, then under our decision in *Swanson* they would not have a vested right to issuance of the patent until resolution of the challenge.[57]

The government argues that until the Secretary of the Interior has decided that a patent application is valid, the applicant has no vested rights at all, even if the applicant is in compliance with the mining

**51.** *Id.* at 1353.

**52.** *Id.* at 1354.

**53.** *See Burrell v. Star Nursery, Inc.,* 170 F.3d 951, 954 (9th Cir.1999).

**54.** 30 U.S.C. § 29 (1994).

**55.** *Id.*

**56.** *Benson Mining,* 145 U.S. at 432, 12 S.Ct. 877.

**57.** *See Swanson,* 3 F.3d at 1353.

laws and the Bureau of Land Management has so found. That is also incorrect. It has long been established that if the applicants are in compliance with the mining laws, then their right to the unpatented claim, or the "title of a locator" is vested even though the Department of the Interior has as yet taken no action at all on their application for a patent.[58] That an applicant has yet to receive, or even apply for, a patent does not mean that the government has plenary power over the mill site.

The owner of a mining claim owns property, and is not a mere social guest of the Department of the Interior to be shooed out the door when the Department chooses. Rather, pursuant to the Multiple Use Act, the Department must continue to co-exist with a holder of a valid claim whose right to possession has vested. Therefore, so long as the Shumways complied with mining law and forest service regulations, they were entitled to the possessory right and title of a locator-a right to possess the mill site-and could not be evicted unless their claim was a sham or otherwise invalid or they failed to observe Forest Service regulations in such a way as to invalidate their claim. The Forest Service does not argue that the Shumways did not have a bona fide mill site claim, so the rest of our inquiry will focus on whether the Shumways failed to comply with permissible Forest Service requirements in such a way as to invalidate their possessory rights.

## II.

Even if the Shumways' right to a patent has not vested, they may still defeat a motion for summary judgment, if they demonstrate that the Forest Service raised the bond requirements arbitrarily, and unreasonably circumscribed their milling operations. To determine whether the Shumways have raised a sufficient factual dispute to defeat summary judgment, we must first revisit the district court's review of the evidence.

A. The district court's treatment of the evidence.

The Shumways argue that the district court erred in treating as undisputed the Forest Service's claims that their mill sites had changed, were strewn with junk, and that cleanup would cost $150,000. The district court rejected Mr. Shumway's affidavit on the ground that it was "self-serving and conclusory" and rejected an affidavit by a Mr. Clay Richard Thorne on the ground that he failed to allege personal knowledge. The district court said that the Shumways had submitted "no evidence" contradicting the government's evidence that much of the material on the mill sites was "scrap or junk." This evidence was material both to whether the Forest Service had authority to order the Shumways to remove the material, and to the amount of a reasonable bond. Because the Shumways had a possessory right to their mill sites, they were not only permitted, but until their right to a patent vested, required to use and occupy the mill sites for milling purposes,[59] and were entitled to have a residence, equipment, materials, tools, and other property on the site incident to milling operations.[60]

■ Regarding the things on the property, the district court was bound, on summary judgment, to determine only whether there was a genuine issue of material fact, and was not empowered to weigh the evidence or determine the truth of the matters asserted.[61] When a respondent to a motion for summary judgment submits

---

58. *See Bradford,* 212 U.S. at 394–95, 29 S.Ct. 349; *Wilbur,* 280 U.S. at 316, 50 S.Ct. 103.

59. 30 U.S.C. § 42 (1994); *United States v. Bagwell,* 961 F.2d 1450, 1455–56 (9th Cir. 1992).

60. *See* 30 U.S.C. § 612(a) (1994) (stating that mining claim shall be used only for "prospecting, mining, or processing operations and other uses reasonably incident thereto").

61. *See* Fed.R.Civ.P. 56(c); *Summers v. A. Teichert & Son, Inc.,* 127 F.3d 1150, 1152 (9th Cir.1997).

proper affidavits by individuals with personal knowledge and other cognizable and significantly probative evidence, such that a reasonable juror drawing all inferences in favor of the respondent could return a verdict in the respondent's favor, the judge must treat that fact as genuinely at issue.[62]

■ Mr. Shumway's affidavit was of course "self-serving," as the district court noted. And properly so, because otherwise there would be no point in his submitting it. That an affidavit is self-serving bears on its credibility, not on its cognizability for purposes of establishing a genuine issue of material fact. If the affidavit stated only conclusions, and not "such facts as would be admissible in evidence,"[63] then it would be too conclusory to be cognizable, but Mr. Shumway's affidavit was not inadmissible for failure to state facts. It does state facts.

Mr. Shumway swears in his 1995 affidavit to a number of material facts for which personal knowledge and competence is established by the affidavit. He says "the operations conducted on my mill sites have not substantially changed over the last 15 years," and "I process ore on a regular basis at the mill site in the same manner I have done for the last 15 years." As to the things on the site, he says "All of the equipment and materials stored on the mill sites have been or were incidental to the milling operations including my horse which I use to ride the perimeter fence of my mill sites and to ride into the wilderness (no vehicles are allowed) to inspect mines that are in the wilderness area." These statements are all "such facts as would be admissible in evidence" on Mr. Shumway's testimony, so the district court erred in disregarding them. They must be taken as true for purposes of determining whether there is a genuine issue of fact precluding summary judgment.

■ As for Mr. Thorne, he established competence as an expert witness on some matters and personal knowledge on others. He says in his affidavit that he is the president of an environmental consulting, cleanup and testing firm, has mined himself in the same area since the early 1970s, has testified in state and federal courts as a mining expert, and personally inspected the Shumway mill site with a Stanford University biochemist he employs. He swears that "I have personally processed many tons of ore from my own mining operations through the Shumway mill site," and "I have personal knowledge that many other mining interests in the area have utilized the Shumway mill site for processing or assaying of their ore." As to the alleged junk, Mr. Thorne says "I have inspected the equipment located on the Shumway mill site and in my estimation the usable mining equipment alone has a replacement value for mining purposes of no less than $400,000." After describing his familiarity with the Shumway mill sites "since their inception," Mr. Thorne says "there has been no substantial change whatsoever in the Shumway mill site operation nor has there been any increase in environmental damage at all for the past several years." As to the tailing ponds, Mr. Thorne says "I have personally inspected the terrain" and states and explains his opinion that there is little if any risk of environmental contamination because of where they are located, even considering the 100 year flood level. He says the chemicals are properly stored, and hazardous chemicals are used only in the laboratory, which is "properly constructed with a cement floor." All this is based on what Mr. Thorne swears in his affidavit he saw with his own educated eyes. His affidavit shows "affirmatively that the affiant is competent to testify" to these matters and that it is "made on personal knowl-

**62.** See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Summers v. A. Teichert & Son, Inc., 127 F.3d 1150, 1153 (9th Cir.1997).

**63.** Fed.R.Civ.P. 56(e).

edge." [64] The district court therefore erred in disregarding it.

■ The Shumways also submitted evidence attached to their brief on appeal, showing that in contrast to the government's new estimates of $150,000 to $200,000 to clean up the site, 75 to 100 times the original bond requirement, they had obtained an actual bid to do the work for $13,115. Because this was not submitted to the district court when it considered the summary judgment motion, it can have no bearing on whether the district court erred.[65] We therefore decide the case without considering it. The evidence erroneously excluded matters, as we explain below.

### B. The Forest Service requirements.

■ The Shumways argue that the Forest Service has exceeded its authority by raising the bond requirements arbitrarily and unreasonably circumscribing their milling operations. The record establishes a genuine issue of fact as to whether this is so.

■ The owner of a mining or mill site claim does not need a patent, or a vested right to issuance of a patent, to possess and use the property for legitimate mining or milling purposes. A mining or mill site claim is "property in the fullest sense of the word." [66] Despite the absence of a patent, the government cannot take the a valid mining claim for public use without paying compensation.[67] The owner of a perfected mining or mill site claim "is not required ... to secure patent from the United States; but so long as he complies with all provisions of the mining laws, his possessory right, for all practical purposes of ownership, is as good as though secured by patent." [68]

Mining claims located after the effective date of the 1955 Multiple Use Act are subject, when a patent has not yet issued, to a right in the United States to manage surface resources and allow others to use surface resources, though these uses "shall be such as not to endanger or materially interfere with prospecting, mining or processing operations or uses reasonably incident thereto." [69] The Shumways do not contest applicability of the Multiple Use Act, and concede for purposes of this appeal that their mill site claims are subject to the right of the United States to manage the surface resources within the limitations of the Act. What the Shumways do contest is whether the Forest Service has stayed within the limitations of the Act.

### 1. Circumscribing activity on the mill site.

The Multiple Use Act empowers the Forest Service to regulate non-mining activity upon mining claims, so long as the non-mining activity does not interfere with mining activities or "uses reasonably incident thereto." [70] The Forest Service has required the Shumways to remove their horse, residential trailer, and "junk." The Shumways apparently have removed the horse, which Mr. Shumway used to reach parts of his claim not accessible by road, but claim that the trailer, equipment, and materials are necessary in his milling operation. The Forest Service itself asked the Shumways to live on the site for security purposes when there was cyanide being used in the mill site operations. The Shumways claim there is a continued need for security on the site to prevent vandalism of their equipment. They have estab-

---

64. Fed.R.Civ.P. 56(e).

65. See USA Petroleum Co. v. Atlantic Richfield, Co., 13 F.3d 1276, 1279 (9th Cir.1994).

66. Bradford, 212 U.S. at 394, 29 S.Ct. 349.

67. See North Amer. Transp., 253 U.S. at 334, 40 S.Ct. 518.

68. Wilbur, 280 U.S. at 316, 50 S.Ct. 103.

69. 30 U.S.C. § 612(b).

70. Id.

lished a genuine issue of fact in this respect.

As to the equipment, or the "junk" as the Forest Service refers to it, the Shumways have also established a factual issue for trial. While the Forest Service might regard the equipment on the Shumways' sites as junk, it has not proved it. The Shumway affidavit establishes a genuine issue as to whether the equipment and materials are incidental to his milling operations. The Thorne affidavit establishes a genuine issue by providing evidence that the Shumways have $400,000 worth of equipment, a proper laboratory properly used, and properly stored valuable chemicals.

The Forest Service's own evidence in some respects establishes a genuine issue in favor of the Shumways. In particular, the Forest Service's photographs, submitted to show the "junk," display much that plainly is not. For example, a photograph of a pile of tires is submitted to show "junk." But to anyone who drives much on bad, unpaved roads, what is notable about the tires is that they are mounted on intact steel wheels. Such mounted tires have a use, and a market among those who operate vehicles in terrain where flats are frequent and bent wheels not unusual. Those of us who occasionally drive on mining roads buy them, to have a couple of extra mounted spares. If the Shumways drive the rigs shown in the exhibits, then it is extremely plausible as Mr. Shumway says in his affidavit, that these mounted tires are equipment incidental to his milling operations. That the Forest Service calls what appear to be good wheels "junk" may reflect a lack of competence on its part to evaluate other people's equipment, rather than a lack of value of the equipment.

Likewise, the Shumways have established a genuine issue about whether their trailer is "junk" that should be removed or a dwelling reasonably incident to mill site

activity for which their claim is held. The Shumways' evidence establishes that (1) they mill at the mill site, which would give them a reason to live there, just as a grocer may have a reason to live upstairs from the store; (2) the Forest Service previously ordered them to have someone living there, to protect against vandals who might spill cyanide; and (3) even though they no longer use cyanide, they still need security to protect the site from vandals. That a sham mining claim cannot furnish legal basis for a dwelling site does not imply that a dwelling is not reasonably incident to a genuine mine or mill site. The need of humans to eat, sleep, and relax in the remote locations where mines have often developed has always necessitated mining camps, bunkhouses, and other dwellings.

### 2. The plan of operations and the bond requirement.

As required by the Forest Service's organic act, the Secretary of Agriculture was delegated the authority to promulgate regulations for the protection of the forests:

> The Secretary of Agriculture shall make provisions for the protection against destruction by fire and depredations upon the public and national forests which may have been set aside ...; and he may make such rules and regulations and establish such service as will insure the objects of such reservations, namely, to regulate their occupancy and use and to preserve the forests thereupon from destruction.[71]

That same organic legislation limited that power, requiring that no such rule or regulation "prohibit any person from entering upon the national forests for all proper and lawful purposes, including that of prospecting, locating and developing the mineral resources thereof." [72] "Such persons must comply with the rules and regulations covering such national for-

---

**71.** 16 U.S.C. § 551 (1994).

**72.** 16 U.S.C. § 478.

ests." [73] Interpreting these statutes in *United States v. Weiss*,[74] we held that the Secretary may adopt reasonable rules and regulations which do not impermissibly encroach upon the *right to use and enjoyment of . . . claims for mining purposes*." [75] Thus, under *Weiss*, the Forest Service may regulate use of National Forest lands by holders of unpatented mining claims, like the Shumways,[76] but only to the extent that the regulations are "reasonable" and do not impermissibly encroach on legitimate uses incident to mining and mill site claims. Congress has refused to repeal the Mining Law of 1872. Administrative agencies lack authority effectively to repeal the statute by regulations.

The Forest Service regulations impose numerous requirements on anyone running a mining operation in the National Forests. Mine and mill site operators must give the Forest Service "a notice of intent to operate," and based on this notice "[i]f the District Ranger determines that such operations will likely cause significant disturbance of surface resources, the operator shall submit a plan of operations," unless the mine operation falls within a small group of exceptions.[77] A plan of operations describes the type of operations proposed and the manner conducted.[78] The plan of operations must be approved by the District Ranger, who must "analyze the proposal, considering the economics of the operation along with the other factors in determining the reasonableness of the requirements for surface resource protection." [79]

The Forest Service may also require a mine or mill site operator to furnish a bond to secure compliance with the plan of operation's reclamation requirement.[80] Because the bond is linked to the reclamation goals of the plan of operations, the bond amount may not be set arbitrarily. The regulations specifically require the Forest Service to consider the costs of reclamation in setting the bond amount: "In determining the amount of the bond, consideration will be given to the estimated cost of stabilizing, rehabilitating, and reclaiming the area of operations." [81] Also, the regulations expressly permit the Forest Service to adjust the bond when the plan of operations changes, and requires the Forest Service to reduce the bond amount as the Forest Service accepts portions of reclamation as completed.[82]

The Forest Service, in 1990, requested that the Shumways submit a new plan of operations since "their operations had changed substantially," citing additional equipment, pile of refuse and change in the type of chemicals used. The Forest Service eventually agreed to approve the plan of operations that the Shumways submitted in December 1990, but increased the bond requirement for the Shumways' mill sites from $5200 to $18,000. But because the Shumways' bond was by a surety not approved by the Department, no surety approved by the Department would write the bond, and the Shumways could not spare $18,000 cash, their plan of operations was not approved. Nothing else about the plan was disapproved except the Shumways' surety on their bond. More recently the Forest Service estimated that the required bond would be between $100,000 and $150,000. The Forest Service justified

**73.** *Id.*

**74.** *United States v. Weiss*, 642 F.2d 296 (9th Cir.1981).

**75.** *Id.* at 299.

**76.** Like the plaintiffs in *Weiss*, the Shumways do not claim that the regulations at issue were unreasonable. Therefore we do not consider that issue in this case.

**77.** 36 C.F.R. § 228.4(a) (1998).

**78.** *See* 36 C.F.R. § 228.4 (1998).

**79.** 36 C.F.R. § 228.5(a).

**80.** *See* 36 C.F.R. § 228.13.

**81.** 36 C.F.R. § 228.13(b).

**82.** *See* 36 C.F.R. § 228.13(c), (d).

this dramatic increase as based on the cost of clean up, due to the "current conditions" at the mill site-including the "substantial amount of equipment and other material, including vehicles, scrap metal, and trash," which they disputably characterized as "junk."

The Forest Service's Complaint asked the court to evict the Shumways because they had not filed a plan of operations nor the required bond. The Shumways argue that the Forest Service would not accept their plan until they filed the requested bond. But the bond amount, argue the Shumways, was impermissibly arbitrary.

Based on our review of the evidence before the trial court, there is an issue of fact as to whether or not the government improperly increased the bond amount to an arbitrary figure, and threatened additional arbitrary increases if the Shumways met the figure. As we discussed above, the Shumways presented evidence contradicting the Forest Service's assertion that the mill site operations had changed substantially and that their equipment and materials were "junk." If that is true, the bond amount should not have drastically changed.

The Shumways have also raised a genuine issue of material fact as to whether remediation would include the cost of hauling away the equipment and materials on the site. If, as the Thorne affidavit says, the equipment has a replacement value of $400,000 then costs of transportation would merely be a factor affecting the price at which the equipment could be sold.

 Nor does the record provide a basis for evicting the Shumways. There is uncontradicted evidence that the Shumways own the mill site claims. There is no evidence in the record before us that (as was the case in *Goldfield Deep Mines*[83]) the Shumways' claim is a sham. Even had there been, the Shumway and Thorne affidavits would establish a genu-

ine issue to the contrary. The Forest Service has offered no explanation for why its disapproval of an operating plan should result in eviction. The more appropriate remedy, consistent with the mining or mill site claim owner's rights as well as the Forest Service's would be an injunction, requiring appropriate measures to protect surface resources or prohibiting mining or milling pending approval of an appropriate plan or bond. Failure to file an approved operating plan cannot, *ipso facto*, cause a forfeiture of the bona fide claim owner's equitable title and possessory right. The Shumways are not guests at their mill site, but property owners. Like someone who proposes to operate a nursing home in an area zoned for single family residential and light retail, regulations may prohibit their proposed use, but it does not follow that they forfeit their interests in the real estate.

### Conclusion

Genuine issues of fact preclude summary judgment.

REVERSED.

WALLACH, District Judge, concurring separately:

I concur in this opinion. The Forest Service would do well to remember that miners explored and built much of the western United States using long-established techniques, some of which dated from the Middle Ages. Many of those methods are still perfectly workable. Mining equipment, especially that used in grading, crushing, and grinding ore may well be old, battered, and rusty and yet still be entirely serviceable, particularly for small operators. It is hardly "junk".

---

**83.** *United States v. Goldfield Deep Mines Co.,* 644 F.2d 1307 (9th Cir.1981).