**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, *Plaintiff-Appellee,* v. ALAN V. PHAN, *Defendant-Appellant,* and THE HARTCOURT COMPANIES INC.; YONGZHI YANG, *Defendants.* | No. 05-55269<br>D.C. No. CV-03-03698-LGB<br>OPINION |

Appeal from the United States District Court
for the Central District of California
Lourdes G. Baird, District Judge, Presiding

Argued and Submitted
February 14, 2007—Pasadena, California

Filed August 29, 2007

Before: Harry Pregerson, William A. Fletcher, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

## COUNSEL

John A. Furutani and Mark C. Peters, Furutani & Peters, LLP, Pasadena, California, for the defendant-appellant.

Jeffrey T. Tao, Senior Counsel, Securities and Exchange Commission, Washington, D.C., for the plaintiff-appellee.

## OPINION

BERZON, Circuit Judge:

The SEC alleged that Alan Phan used stock registered only for employee compensation purposes to raise capital from the public for the cash-strapped publicly traded company he led in 1999, thereby violating federal securities law. The district court granted summary judgment in favor of the SEC, holding that Phan both engaged in an unregistered securities sale and committed securities fraud. In this appeal, Phan contends that the admissible evidence, viewed in the light most favorable to him, supports his position rather than the SEC's.

We affirm the district court's summary judgment rulings concerning the registration issue. Whether or not the stock was initially issued to compensate bona fide consulting services, Phan was involved in its subsequent resale to raise capital for the company and thereby violated the registration provision of federal securities law. We agree with Phan, however, that the summary judgment record does not demonstrate that he made misstatements material as a matter of law. We therefore reverse the grant of summary judgment in favor of the SEC with respect to the antifraud claims and vacate much of the relief the district court awarded against Phan.

**I.**

During the relevant time period, Phan was chairman, CEO, and president of the Hartcourt Companies Inc. ("Hartcourt"), a publicly traded business development and investment holding company based in Long Beach, California. Believing, as did many others during the heady dot-com bubble of the late 1990s, that fortunes could be made by investing in the technology sector, Hartcourt decided to enter the Chinese technology market. To this end, Hartcourt entered into a pair of investment agreements with companies based in China and Hong Kong that obligated Hartcourt to pay those companies several million dollars in cash during the later half of 1999. As was true of many other companies venturing into the technology sector in the late 1990s, Hartcourt's ambition outstripped its financial resources, and the company found itself in the fall of 1999 having difficulty making the promised payments to its investment partners.

To help it find business opportunities in China, Hartcourt sought the assistance of Yongzhi Yang, a math professor in Alabama who worked part-time as a consultant to American companies seeking to invest in Chinese technology firms. According to Yang, he and his wife, Yan Wu, ran the consulting business as a joint enterprise; Yang preferred to use only Wu's name on public documents to hide from his university the fact that he moonlighted.

Hartcourt entered into a written Fee and Option Agreement (the "Fee Agreement") with Wu on August 23, 1999. The Fee Agreement specified that Wu "will use [her] best efforts to search for, identify and make known to [Hartcourt], Internet-related businesses and Assets ("Opportunities") which qualify as potential acquisitions by [Hartcourt]." The Fee Agreement explained that Wu's "talents and services are of a special, unique, unusual and extraordinary character and are of particular and peculiar benefit and importance to [Hartcourt]."

The Fee Agreement stated that Hartcourt would provide Wu with an option to purchase one million Hartcourt shares at a price of $1.25 per share, approximately Hartcourt's then-current share price. The Fee Agreement represented that this payment was "to satisfy [Wu's] time and expense incurred, up to and including the first acquisition by [Hartcourt] of an Opportunity introduced or arranged by [Wu]," and that Wu "has not been engaged to perform, nor will [she] agree to perform any services in connection with capital raising transactions."[1] The Fee Agreement specified that Wu would serve as a consultant through December 30, 1999, but that either party could terminate her service on thirty-days notice. The Fee Agreement contained no provision requiring Wu to forfeit the option if the Fee Agreement was terminated early, although it did state that Hartcourt "shall only be liable for payment of fees earned by [Wu] as a result of work prior to the effective date of the termination."

Under the terms of a separate Option Agreement (the "Option Agreement"), also signed on August 23, 1999, Hartcourt granted Wu an option to purchase one million shares to fulfill the promise made in the Fee Agreement. Wu had until December 1, 2001 to exercise the option and was required to pay the $1.25 per share at the time of exercise to receive the stock (the "prepayment" requirement). In other words, Wu immediately became the owner of the *options*, but would not receive the one million shares of Hartcourt until she paid $1.25 million.

Both agreements were filed with the SEC on September 7, 1999, as attachments to a Form S-8, which registered the issuance of those one million shares.[2] This form and its attach-

[1]The agreement further specified that "[i]t is mutually understood and agreed that any fees for services provided by [Wu] on behalf of or which results in some benefit for [Hartcourt] in connection with a capital raising transaction shall be negotiated separately from this Agreement and paid by [Hartcourt] in cash."

[2]The relevant Form S-8 also registered the issuance of stock to compensate several other individuals. The SEC does not dispute the legitimacy of those transactions.

ments were publicly available upon filing. The Securities Act of 1933 ("the 1933 Act"), 15 U.S.C. §§ 77a-77aa, requires publicly traded companies to register all new issuances of stock. A Form S-8 provides a streamlined method of registering stock issued to compensate employees and consultants, as opposed to the more detailed and prolonged process required to register shares used to raise capital. Registration of Securities on Form S-8, 64 Fed. Reg. 11,103, 11,103 (Mar. 8, 1999) ("S-8 Release") (codified at 17 C.F.R. § 239.16(b)). By signing the S-8 registration, Hartcourt explicitly agreed to amend the form "during any period in which offers or sales are being made" to "reflect . . . any facts or events arising after the effective date of the registration statement . . . which, individually or in the aggregate, represents a fundamental change in the information set forth in the registration statement" and to "include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement." 17 C.F.R. § 229.512(a)(1).

Right after it filed the S-8 form, Hartcourt issued one million shares of common stock to Wu. Contrary to the Option Agreement, however, Wu (and Yang) paid nothing to Hartcourt at that time. In a declaration submitted in the district court Yang explained that he pressed for the elimination of the prepayment requirement because "I wanted some guarantee that my wife and I would receive our option shares, since we did not have the money to pay the option price, and it made no sense for us to bring companies to Hartcourt if there was no guarantee that we would receive the shares."

Phan stated in his declaration that to satisfy Yang's request he orally modified the agreement on behalf of the company, by waiving the prepayment requirement and instead allowing Wu to receive the shares in exchange for a promissory note to pay Hartcourt $1.25 million.[3] Hartcourt did not note this

[3]Phan's explanation of this modification has some holes, both logical and factual. It requires Wu, who apparently did not have the liquid assets

modification in its S-8 form, so the supposedly superseded terms were the only publicly disclosed information about the arrangement between Hartcourt and Wu.

Within months, Wu resold most of the one million shares. The bulk of the shares were sold to Rubin Investment Group ("Rubin") in a November 1, 1999 transaction involving 500,000 shares and a November 4, 1999 transaction involving 300,000 shares. The sales were at prices well below the $1.25 per share that Wu supposedly was obligated to repay Hartcourt. Phan stated in his declaration that he suggested Yang contact Rubin and that he directed Hartcourt's lawyer to draft a contract for one of these stock sales. Phan also acknowledged that Hartcourt's demand in October 1999 that Wu repay the $1.25 million promissory note generated Wu's decision to sell the shares.[4] Yang likewise stated in his declaration that he informed Phan that Wu would be forced to sell the shares if Hartcourt demanded repayment of the loan, and "Phan insisted that if that was the only way we could pay Hartcourt, then we should sell the shares and get Hartcourt paid."

At Phan's direction, Wu wired the approximately $680,000 in proceeds of these two sales to Hartcourt's investment part-

to pay for the shares, to have taken on the risk that she would be unable to resell the shares for at least $1.25 million. Under the original Option Agreement, in contrast, she could have waited until the shares were worth more than $1.25 million, bought them then, and then sold $1.25 million worth, assuring against any risk. Moreover, Phan never produced a copy of the purported promissory note, there was apparently no payment schedule agreed upon, and Hartcourt never required Wu to pay the full $1.25 million. Nevertheless, Phan's declarations maintained that at the time Hartcourt eliminated the prepayment requirement, it "fully expected" to receive $1.25 million from Wu.

[4]In a SEC investigatory hearing, Yang testified that Phan "started to take shares away for Rubin" in order to cover the company's outstanding debts. In his later declaration, Yang framed the sale as a response to Hartcourt's demand to repay the promissory note.

ners in China and Hong Kong, to pay Hartcourt's outstanding debts. On December 8, 1999, she also wired one of these partners more than $81,000, from money she received upon selling Hartcourt shares. Phan characterized these transactions as an arrangement "to avoid delay" by "eliminat[ing] the middleman," because Hartcourt would have immediately wired Wu's payments to its creditors. Wu also transferred 36,400 shares on November 4, 1999 directly to Perfect Data Corporation, another creditor of Hartcourt.

Yang made a number of smaller purchases and sales of Hartcourt's stock during the fall of 1999, primarily for his own benefit. During the same period, Hartcourt promised Yang that he would receive 100,000 shares in exchange for helping Hartcourt enter into a joint venture with Chinese technology company Innostar. The defendants explain that this promise caused Hartcourt to forgive Wu's debt for the purchase price of 100,000 of the original one million shares in lieu of issuing additional shares.

After conducting an investigation, the SEC filed a civil complaint against Phan, Yang, and Hartcourt, exercising its power to seek injunctions and fines against those who violate the 1933 Act and the Securities Exchange Act of 1934 ("the 1934 Act"). *See* 15 U.S.C. §§ 77t, 78u. The SEC alleged that the defendants violated Section 5 of the 1933 Act, 15 U.S.C. § 77e, which forbids the unregistered sale of securities. The SEC also alleged violations of the antifraud provisions of Section 17(a) of the 1933 Act, 15 U.S.C. § 77q(a), Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, based on materially untrue statements made in Hartcourt's S-8 filing.[5]

After both parties moved for summary judgment, the dis-

[5]The SEC's complaint also alleged that the defendants committed securities fraud by including untrue statements in a series of press releases. That theory of liability was subsequently abandoned.

trict court granted the SEC's motion and denied the defendants' motion. The district court permanently enjoined the defendants from violating securities laws, fined the defendants — imposing a $55,000 fine against Phan, a $20,000 fine against Yang, and a $275,000 fine against Hartcourt — ordered Hartcourt and Yang to disgorge ill-gotten gains — $819,363 and $186,604, respectively — and barred Phan from serving as an officer or director of a publicly traded company. Phan appealed the judgment; Yang and Hartcourt did not.

We review de novo the district court's decisions on the summary judgment motions. *SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1190 (9th Cir. 1998). In our review, we must "determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Johnson v. Columbia Props. Anchorage, LP*, 437 F.3d 894, 898 (9th Cir. 2006).

## II.

It is unlawful to participate in an interstate or mail sale of unregistered securities. *See* 1933 Act § 5(a), (c), 15 U.S.C. § 77e(a), (c);[6] *see also Berckeley Inv. Group, Ltd. v. Colkitt*,

[6]Section 5 provides:

(a) Sale or delivery after sale of unregistered securities

Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

. . .

455 F.3d 195, 212 (3d Cir. 2006) ("In order to establish a Section 5 violation, [plaintiff] must point to evidence that: (1) no registration statement was in effect as to the securities; (2) [defendant] sold or offered to sell the securities; and (3) the sale or offer was made through interstate commerce."). By its terms, Section 5 of the 1933 Act creates liability for *any* securities sale for which "a registration statement is [not] in effect;" it does not limit liability to initial distribution. 15 U.S.C. § 77e(a); *see also SEC v. Cavanagh*, 155 F.3d 129, 133 (2d Cir. 1998) ("Each sale of a security . . . must either be made pursuant to a registration statement or fall under a registration exception." (quoting Eddy J. Rogers, Jr. & Jason Weeden, *Resales of Securities Under the Securities Act*, 1012 PLI/Corp. 285, 287 (Sept. 1997)));[7] *Allison v. Ticor Title Ins. Co.*, 907 F.2d 645, 648 (7th Cir. 1990) ("Section 5 . . . applies to transactions; each sale must be registered or exempt."); *Shaw v. United States*, 131 F.2d 476, 479 (9th Cir. 1942) (noting that the registration requirement could apply to a company's resale of a batch of shares initially distributed using a statutory exemption from registration); 1 LOUIS LOSS ET AL., SECURITIES REGULATION 591 (4th ed. 2006) ("On its face, § 5 is all embracing."). Section 4(1) of the 1933 Act, however, shields any "transactions by any person other than an issuer, underwriter, or dealer," thus exempting from Section 5 ordi-

---

> (c) Necessity of filing registration statement
>
> It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security . . . .

15 U.S.C. § 77e.

[7]In *Cavanagh*, the Second Circuit faced circumstances quite similar to those here and held that the defendant violated Section 5 through a resale of shares even if the initial distribution of those shares was validly registered using an S-8 form. *See* 155 F.3d at 133-34.

nary resales of stock between independent parties. 15 U.S.C. § 77d(1); *see also SEC v. Murphy*, 626 F.2d 633, 648 (9th Cir. 1980) ("Section 4(1) was designed to exempt routine trading transactions with respect to securities already issued . . . ."); Loss, *supra*, at 591 (explaining that § 4(1) exempts an unregistered resale of blue-chip stock between friends from violating § 5).

**[1]** The district court held that Phan violated Section 5 because a large portion of the stock was resold by Wu to raise capital for Hartcourt without filing an additional registration statement.[8] The registration dispute in this case thus centers on whether, *at the time of Wu's resales* of Hartcourt's stock, the September 7, 1999 S-8 "registration statement [was] in effect as to [the] security." 15 U.S.C. § 77e(a).[9]

**[2]** SEC regulations provide that an S-8 registration form can be used by a company only to issue stock as a means of compensating consultants for bona fide services not connected with raising capital. First, 17 C.F.R. § 239.16b(a)(1)

[8]Given the focus of Section 5 on whether the "the registration statement *is* in effect" or "*has been* filed," 15 U.S.C. § 77e(a), (c) (emphases added), and the defendants' summary judgment evidence that the stock was issued originally with a bona fide compensatory purpose as required by the S-8 form, on this summary judgment record there is a material dispute of fact concerning whether Hartcourt's *initial distribution* of the stock to Wu violated the statute because the transaction from the outset was for purposes not authorized by an S-8 registration. The summary judgment for the SEC therefore cannot be sustained on the ground that an S-8 registration was improper with regard to the initial transaction.

[9]The district court found two additional reasons why Phan violated Section 5: (1) The initial distribution of the one million shares to Wu was not covered by the September 7, 1999 statement because the form did not reflect the "fundamental[ ] change[ ]" caused by removing the prepayment requirement; and (2) Yang received 100,000 free shares in connection with the Innostar deal, and those shares were not registered. Because we hold that Wu's capital-raising resale of the stock sufficiently supports the holding that Phan violated Section 5, we do not address the two other rationales offered by the district court.

provides that an S-8 form may be used to register securities "to be offered to its employees[[10]] . . . under any employee benefit plan." In turn, 17 C.F.R. § 230.405 provides that consultants may participate in an "employee benefit plan," but "only if . . . [t]hey provide *bona fide* services to the registrant; and . . . [t]he services are not in connection with the offer or sale of securities in a capital-raising transaction, and do not directly or indirectly promote or maintain a market for the registrant's securities." (Emphasis added).

**[3]** The SEC interprets these regulations flatly to prohibit the use of an S-8 form to register shares that are sold to the public to raise capital. As the SEC's published explanation of amendments to the regulations promulgated in 1999 specifies:

> [S]ome issuers and promoters have misused Form S-8 as a means to distribute securities to the public without the protections of registration under Section 5 of the Securities Act. For example, the issuer registers on Form S-8 securities nominally offered and sold to employees or, more commonly, to so-called "consultants." These persons then resell the securities in the public markets, at the direction of the issuer or a promoter. In some cases, the consultants or employees perform limited or no additional services for the issuer. The consultants or employees then either remit to the issuer the proceeds from these resales, or apply those proceeds to pay expenses of the issuer that are not related to any service provided by the consultants or employees.
>
> *Registration of the shares on Form S-8 does not*

[10]Paragraph 1.(a) of General Instruction A to the S-8 form, which was published in the Federal Register upon promulgation but not codified in the Code of Federal Regulations, provides that for the purposes of S-8 registration, the term employee includes consultants. S-8 Release, 64 Fed. Reg. at 11,117.

> *accomplish Section 5 registration of these public sales.* The transaction that takes place (a capital-raising transaction with the public) is a different transaction from the transaction registered on Form S-8 (a compensatory transaction with employees, including consultants). Although the issuer purports to sell securities to employees, the securities instead are sold to the public. The "employees" act as conduits by selling the securities to the public and distributing the proceeds (or their economic benefit) to the issuer. This public sale of securities by the issuer has not been registered, although the Securities Act requires registration. The failure to register this sale of securities deprives public investors of the protections afforded by the Securities Act.

S-8 Release, 64 Fed. Reg. at 11,103-04 (emphasis added) (footnote omitted).

At the same time, the SEC explained the circumstances in which it would view a transaction as seeking to raise capital from the public:

> Form S-8 is not available to register offers and sales of securities to . . . consultants and advisors where:
>
> • By prearrangement or otherwise, the issuer or a promoter controls or directs the resale of the securities in the public market; or
>
> • The issuer or its affiliates directly or indirectly receive a percentage of the proceeds from such resales.

*Id*. at 11,106 (footnote omitted). The SEC has also explained that the "controls or directs" test is intended to "focus[ ] on the issuer's power to make a resale happen, or to make it happen at a particular time." *Id*. at 11,106 n.30. And the "directly

or indirectly receive" test "will be satisfied where the issuer or its affiliates receive an economic benefit from the resale proceeds, such as when the proceeds are used to pay the issuer's operating expenses or are paid to the issuer's control persons." *Id.* at 11,106 n.31.

**[4]** We owe substantial deference to an agency's published interpretation of its own regulations and will treat it as controlling if it is not "plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (internal quotation marks omitted); *see also Epstein v. MCA, Inc.*, 50 F.3d 644, 654 n.17 (9th Cir. 1995) (applying such substantial deference to an interpretation published in a SEC Release), *rev'd on other grounds sub. nom Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367 (1996). Such deference is particularly sensible here in light of the SEC's broad statutory authority to design the schema for registering securities. *See* 15 U.S.C. § 77s. Because the SEC's interpretation is not "plainly erroneous or inconsistent" with regulations that already draw a distinction between bona fide consulting and services that aid a capital-raising transaction, we hold that an S-8 form cannot be used to register a securities transaction in which the issuer or promoter controls or directs a resale or directly or indirectly receives a percentage of the proceeds.

**[5]** Applying this holding, we conclude that Wu's resale of Hartcourt's publicly traded stock could not be covered by an S-8 registration. That resale had the effect of supplying the company with capital from the public at the company's behest.

The summary judgment record, viewed in the light most favorable to Phan, establishes both that Wu transferred to Hartcourt's creditors the proceeds of the stock sales she made through Rubin and her brokerage account to satisfy the company's outstanding debts and that Hartcourt was the impetus behind these resales. Phan's declaration states:

> Hartcourt made demand [sic] for payment from Yang and Yan Wu in October 1999. Yang agreed to sell the Hartcourt shares which he and his wife received from Hartcourt. He asked me if I knew anyone who could sell shares in large lots, and I directed him to call Rubin Investments, whose business card was on my desk at the time and whom had recently made a presentation to Hartcourt where they had described themselves as institutional investors which had an interest in investing in Hartcourt. In an effort to assist Yang and Yan Wu, I later asked my attorney to prepare a simple share purchase agreement which Yan Wu could use in selling the shares, since Yang told me that he and his wife were unfamiliar with the process. . . .
>
> . . .
>
> From the payments which Hartcourt demanded that Yang and Yan Wu make pursuant to their exercise of the option shares, I instructed Yang to send those sums to third parties designated by Hartcourt instead of sending the money directly to Hartcourt.

Likewise, a declaration submitted by Yang stated:

> I advised Alan Phan that [Wu and I] did not have the money to pay off what was owed, and that the only way we could come up with a major portion of what was owed would be to sell the shares we received. Phan insisted that if that was the only way we could pay Hartcourt, then we should sell the shares and get Hartcourt paid.

**[6]** This undisputed evidence demonstrates that it was the company's directives to Wu that resulted in the sale of the stock and therefore in raising capital for the company. Given these circumstances, the resale of Wu's stock could not val-

idly be registered on Form S-8. Hartcourt — the issuer of publicly traded stock — “control[led] or direct[ed] [Yang’s] resale of the securities in the public market” through its demand for repayment of the loans, because the demand “ma[d]e a resale happen.” *See* S-8 Release, 64 Fed. Reg. at 11,106 & n.30. Further, Hartcourt “indirectly receive[d] a percentage of the proceeds from such resale” when the proceeds of the resale were paid to its creditors. *Id.* at 11,106 & n.31.

Phan asserts that the foregoing analysis is not here pertinent, as long as the defendants intended at an earlier time — when Hartcourt initially granted Wu the one million shares — to provide compensation for bona fide consulting. But, as we have noted above, liability need not turn on whether Hartcourt’s initial grant of the shares to Wu was properly registered. Even if the S-8 form was effective as of the date of the initial grant because Hartcourt intended to compensate Wu for bona fide consulting services — as we must accept, construing the summary judgment record in the light most favorable to the defendants — the S-8 registration ceased to be effective once Hartcourt sought to use the shares for a capital-raising purpose. *See* 1 THOMAS LEE HAZEN, TREATISE ON THE LAW OF SECURITIES REGULATION § 3.4[4][E], at 252 (5th ed. 2005) (“Unlike most other registered offerings, securities offered in a Form S-8 registration may be subject to resale restrictions.”).

At the point at which a company seeks to redistribute into the public market the securities it issued to consultants, then, “Form S-8 is not available to register offers and sales of securities to . . . consultants.” S-8 Release, 64 Fed. Reg. at 11,106; *see also* 15 U.S.C. § 77f(a) (“A registration statement shall be deemed effective only as to the securities specified therein *as proposed to be offered*.” (emphasis added)).[11] As

[11]When securities registered using an S-8 form are used for capital-raising purposes, the SEC apparently views the registration as becoming a legal nullity from the moment it was filed. S-8 Release, 64 Fed. Reg. at

the previous analysis demonstrates, the circumstances surrounding Wu's resale of the stock clearly fall within the SEC's criteria for a capital-raising transaction. Consequently, no "registration statement [was] in effect" as to Wu's stock at the time of resale, in violation of Section 5. 15 U.S.C. § 77e(a); *see SEC v. DCI Telecoms., Inc.*, 122 F. Supp. 2d 495, 501 (S.D.N.Y. 2000) ("A violation of the registration provisions exists where the issuing company raises capital via its employees' sale of stock, regardless of the existence a [sic] preconceived plan. . . . Regardless of intent, a public company and its officers violate the registration provisions by using employees as conduits for the sale of S-8 stock to the public because the true transaction — the distribution of securities to the pubic — is not registered."); Sky Scientific, Inc., Initial Decision Release No. 137, 69 SEC Docket 763, 1999 WL 114405, at *30-32 (Mar. 5, 1999) (similar holding by an administrative law judge in a SEC proceeding); *see also SEC v. Calvo*, 378 F.3d 1211, 1219 (11th Cir. 2004) (applying the principle that the 1933 Act creates strict civil liability to a Section 5 claim). The (assumed for purposes of summary judgment) initial legitimacy of Hartcourt's S-8 registration form is thus irrelevant to Phan's liability under Section 5, as Wu ultimately resold her shares to raise capital for Hartcourt at the company's behest.[12]

11,106 (specifying that when stock is *resold* for capital-raising purposes, "Form S-8 is not available to register offers and sales of securities *to . . . consultants*," whether the resale comes about "[b]y prearrangement *or otherwise*" (emphases added)). We do not understand this interpretation as deeming the consultant's initial receipt of shares violative of Section 5 if the invalidating event happened only later. *See supra* note 8. At any rate, we need not address whether that is so, as we uphold summary judgment as to Phan's Section 5 liability on the basis of the resale alone.

[12]Phan does not challenge the district court's holding that the defendants failed to prove a Section 4(1) defense with regard to Wu's resales because they "were directed by Phan, and were expressly made to benefit Hartcourt." We therefore do not examine this question.

Phan also argues, in a cursory fashion without citing any authority, that "[h]e did not participate in any sale of S-8 shares . . . nor did he benefit from any such sales." Although we have "recognize[d] that [a defendant's] role in the transaction must be a significant one before [Section 5] liability will attach," we have defined a "significant" role to include one who is both a "necessary participant" and "substantial factor" in the sales transaction. *Murphy*, 626 F.2d at 648, 652.[13]

**[7]** Applying this standard, Phan's role in assisting Wu's resale satisfied the "sold or offered to sell" element of Section 5. As detailed in the defendants' own declarations, quoted

[13]Prior to *Pinter v. Dahl*, 486 U.S. 622 (1988), we had held that an individual was liable under Section 12 of the 1933 Act — the provision that creates a private cause of action for Section 5 violations — when he was a "necessary participant" and "substantial factor" in the sale or offer of an unregistered security. *Anderson v. Aurotek*, 774 F.2d 927, 930 (9th Cir. 1985) (per curiam). *Pinter* rejected that standard as too lax to create Section 12 liability. 486 U.S. at 648-50 & n.25. Section 12 specifies that "[a]ny person who — (1) offers or sells a security in violation of [Section 5] . . . shall be liable . . . to the person purchasing such security *from him.*" 15 U.S.C. § 77l(a) (emphasis added). The Supreme Court keyed in on the "from him" language of Section 12 in rejecting our "necessary participant"/"substantial factor" test: "Those courts that have adopted the approach have not attempted to ground their analysis in statutory language. . . . The 'purchase from' requirement of § 12 focuses on the defendant's relationship with the plaintiff-purchaser. The substantial-factor test, on the other hand, focuses on the defendant's degree of involvement in the securities transaction and its surrounding circumstances." *Pinter*, 486 U.S. at 651.

Section 5 contains no language similar to the "from him" language of Section 12. So *Pinter* did not overturn our holding in *Murphy*, that the SEC establishes an actionable violation of Section 5 when it shows a defendant is both a "necessary participant" and "substantial factor" in the sales transaction. *Cf. Calvo*, 378 F.3d at 1215 (observing, in a 2004 decision, that "the SEC must prove that the defendant was a 'necessary participant' or 'substantial factor' in the illicit sale" to establish Section 5 liability and citing *Murphy*); *Geiger v. SEC*, 363 F.3d 481, 488 (D.C. Cir. 2004) (observing in a challenge to a SEC enforcement action that "[w]e do not believe *Pinter* is on point" as to the scope of Section 5 liability).

above, Phan chose the date to call in Wu's $1.25 million obligation to Hartcourt, directed Wu to sell the shares in order to repay her obligation, provided Yang with a buyer, directed Hartcourt's lawyer to draft a stock sale contract, and instructed Wu where to send the proceeds. Phan therefore was both a "necessary participant" and a "substantial factor in" Wu's resale. *See id*. at 652; *see also Geiger*, 363 F.3d at 487-88 ("[S]omeone who played a role as crucial as [the defendant's] — finding the buyer, negotiating the terms, facilitating the resale — cannot escape liability [under Section 5] by avoiding direct involvement in the final [sales] act.")

**[8]** In sum, the district court properly granted summary judgment in favor of the SEC on the Section 5 cause of action.[14]

## III.

The district court also granted summary judgment in favor of the SEC on its claim that Phan committed securities fraud through his involvement in filing Hartcourt's S-8 registration form. The fraud claim is certainly supported by some of the evidence, indeed much of it. But viewing all of the evidence in the light most favorable to Phan, as we must on summary judgment, we conclude that there are disputes of material fact that preclude summary judgment. We therefore reverse the district court's grant of summary judgment in favor of the

[14]We find no merit in Phan's argument, which does not refer to any legal authority, that summary judgment should have been granted in his favor because "the district court improperly went beyond plaintiff's theory of the case" as contained in the SEC's response to the defendants' interrogatories. Although the interrogatory answer cited by Phan intertwines allegations about the lack of legitimate consulting and the issuance of false press releases, it clearly states the SEC's contention that "[t]he profits from sales of the S-8 Shares were used to provide capital for Hartcourt's investments and acquisitions." Phan cannot claim harm — let alone harm that dictates summary judgment in his favor — from the SEC's ultimate reliance on a *less* sweeping theory. *See Scott & Fetzer Co. v. Dile*, 643 F.2d 670, 673-74 (9th Cir. 1981) (noting discovery provisions are intended to prevent parties from facing unexpected surprises later in the litigation).

SEC but affirm the denial of Phan's motion for summary judgment.

Section 17(a) of the 1933 Act,[15] Section 10(b) of the 1934 Act,[16] and Rule 10b-5[17] "forbid making [1] a material mis-

---

[15]Section 17(a) provides:

> It shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly
>
> (1) to employ any device, scheme, or artifice to defraud, or
>
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
>
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q.

[16]Section 10(b) provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange —
>
> . . .
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.

[17]Rule 10b-5 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

statement or omission [2] in connection with the offer or sale of a security [3] by means of interstate commerce. . . . Violations of Section 17(a)(1), Section 10(b) and Rule 10b-5 require *scienter*. . . . Violations of Sections 17(a)(2) and (3) require a showing of negligence." *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 856 (9th Cir. 2001). Even though the transaction registered by the S-8 form did not involve distribution of shares to the public market, the SEC can prove fraud by showing that an average investor would find any misstatements that the form contained to be material because the form was publicly disseminated. *See SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993).

Phan primarily challenges the district court's holding that the evidence viewed in the light most favorable to him demonstrated the materiality of his misstatements.[18] The antifraud provisions' materiality element is satisfied only if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)) (internal quotation mark omitted) (applying test

---

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

[18]Phan also challenges the district court's holding that the record undisputably demonstrated his scienter. We resolve this appeal on the basis of the materiality requirement and so do not reach the scienter question.

to claims under Section 10(b) and Rule 10b-5); *see also SEC v. Rogers*, 790 F.2d 1450, 1458 (9th Cir. 1986) (applying a "reasonable investor" test to Section 17), *overruled on other grounds by Pinter v. Dahl*, 486 U.S. 622 (1988).

**[9]** Determining materiality in securities fraud cases "should ordinarily be left to the trier of fact." *In re Apple Computer Secs. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989). Materiality typically cannot be determined as a matter of summary judgment because it depends on determining a hypothetical investor's reaction to the alleged misstatement. As the Supreme Court has explained:

> The determination [of materiality] requires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact. Only if the established omissions are "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality" is the ultimate issue of materiality appropriately resolved "as a matter of law" by summary judgment."

*TSC Indus.*, 426 U.S. at 450 (quoting *Johns Hopkins Univ. v. Hutton*, 422 F.2d 1124, 1129 (4th Cir. 1970)) (footnote omitted);[19] *see also* 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE: CIVIL § 2729, at 556 (3d ed. 1998) ("[*E*]*ven when there is no dispute as to the facts*, it usually is for the jury to decide whether the conduct in question meets the reasonable-person standard." (emphasis added)), *cited in*

[19]More recently, the Supreme Court — in holding that the question of materiality must be submitted to the jury in criminal perjury prosecutions — has cited the materiality element of securities fraud as an "application-of-legal-standard-to-fact sort of question . . . , commonly called a 'mixed question of law and fact,' [that] has typically been resolved by juries." *United States v. Gaudin*, 515 U.S. 506, 512 (1995) (citing *TSC Indus.*, 426 U.S. at 450).

*TSC Indus.*, 426 U.S. at 450 n.12. Thus, for example, the Supreme Court has refused to hold as a matter of law that a difference between payment in warrants worth $5.25 each and warrants worth $3.50 each would be material to an investor, holding instead that, even if the company's statements could have misled investors to believe that the higher value was correct, the significance of the difference in value to an investor was a question of fact for the jury. *Id*. at 459-60.

**[10]** Applying this strict standard and evaluating the securities fraud claim in light of the record viewed most favorably to Phan, we cannot find that the misstatements made in Hartcourt's S-8 registration form rise to the level of obviousness necessary to award summary judgment.

**A.**

The SEC argues that the many misrepresentations and omissions in the S-8 form as of the moment it was filed on September 7, 1999 made materiality so obvious so as to warrant summary judgment. The evidence in the record is in conflict, however, as to many important facts that could support this conclusion. For example: whether Wu had a bona fide obligation fully to repay Hartcourt for the stock after the transaction was restructured; whether Hartcourt did initially intend the shares to compensate Yang and Wu for consulting work; and whether Hartcourt issued the shares to Wu expecting that they would be resold to raise capital from the public to satisfy the company's pressing debts. The S-8 registration would certainly have contained material misstatements if those disputed facts were resolved in the SEC's favor. Obviously, an average Hartcourt investor would want to know if the company was giving away a million shares of stock for free or needed to sell stock quickly in order to stave off a liquidity crisis. But we cannot uphold summary judgment in favor of the SEC on that basis, as the underlying facts have not been conclusively established.

The district court determined otherwise after it refused to credit critical statements in Phan's and Yang's declarations. Those statements attested to a restructuring of the transaction that created a bona fide obligation for Wu fully to repay Hartcourt for the stock.[20] The district court viewed the declarations as "uncorroborated and self-serving" and as contradicted by earlier testimony in the record, and so disregarded the statements regarding restructuring. The district court's characterizations of the statements cannot justify disregarding them.

As we have previously noted, declarations oftentimes will be "self-serving" — "[a]nd properly so, because otherwise there would be no point in [a party] submitting [them]." *United States v. Shumway*, 199 F.3d 1093, 1104 (9th Cir. 1999). In most cases, consequently, "[t]hat an affidavit is self-serving bears on its credibility, not on its cognizability for purposes of establishing a genuine issue of material fact." *Id*. Only in certain instances — such as when a declaration "state[s] only conclusions, and not 'such facts as would be admissible in evidence,' " — can a court disregard a self-serving declaration for purposes of summary judgment. *Id*. (quoting FED. R. CIV. P. 56(e)).

*Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054 (9th Cir. 2002), relied upon by the district court as supporting the disregard of "uncorroborated and self-serving" declarations, involved just such a situation: The declaration in question included facts beyond the declarant's personal knowledge and "provide[d] no indication how she knows [these facts] to be true." *Id.* at 1059 & n.5, 1061. Phan's and Yang's declarations

[20]The district court did not, however, exclude any of this evidence from the summary judgment record. Therefore, our review is de novo; the abuse of discretion standard, applicable to review of evidentiary rulings made in the course of deciding a summary judgment motion, *Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir. 2002), does not apply. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1156-59 (9th Cir. 1999) (reviewing de novo a district court's decision to disregard the plaintiff's declaration as unbelievable and therefore to award summary judgment to the defendant).

do not have a similar defect, as they involve the declarant's own actions. The personal actions of Phan and Yang are central to Wu's obligation to repay Hartcourt for the stock, especially as the record shows that Wu was basically a figurehead rather than an independent actor.

**[11]** Moreover, it is unremarkable that the defendants could not otherwise corroborate their personal conversations. That is likely to be the case regarding most conversations between two people, and does not disqualify either participant from testifying about the interchange — subject, of course, to a credibility determination by the finder of fact. The district court was thus wrong to disregard the declarations as "uncorroborated and self-serving."

Nor was it proper to disregard Phan's and Yang's declarations based on our case law that treats declarations "flatly contradict[ed]" by the declarant's prior testimony as "sham[s]." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 267 (9th Cir. 1991). Phan's deposition testimony that he directed his staff to send Wu a promissory note with a six-month term does not "flatly contradict" the declaration's assertion that Hartcourt could demand repayment in October 1999. The deposition provided only cursory testimony about the terms, and Phan stated in his deposition that he was unsure whether such a promissary note was even actually sent. Moreover, Yang's testimony during the SEC's investigative proceedings — that Phan "sa[id] do this deal, sell that many shares and whatever money you get send to [Hartcourt's creditor]" — is entirely consistent with the statements in Yang's later declaration that Phan demanded repayment with the understanding that Wu would have to sell the stock.

**[12]** The upshot is that for present purposes, we must take the description of the option transaction contained in Yang's and Phan's declarations as true. In other words, we must accept that Phan modified the Option Agreement at Wu's request to replace the prepayment requirement with a $1.25

million loan obligation and that Wu initially received the stock for compensatory purposes, and cannot in evaluating the grant of summary judgment on the fraud issue rely on any misstatement concerning those representations.

**[13]** At the same time, it is quite clear that, by the time the form was filed, Yang and Wu, by their own account, had arranged to obtain the shares without paying up front, yet the form stated otherwise. That means that in evaluating the SEC's summary judgment motion, we *can* rely on the one undisputed misstatement in the S-8 registration form: the assertion that Wu would be required to pay $1.25 million in cash upon exercising her option to receive the one million Hartcourt shares.

## B.

**[14]** Given that understanding of the underlying facts, we cannot conclude on the present summary judgment record that, by failing to disclose the payment term change, the S-8 registration form contained a misstatement "obviously important to an investor." *See TSC Indus.*, 426 U.S. at 450. The SEC, which both bears the burden of proof and is the party moving for summary judgment, submitted no evidence to the district court demonstrating the materiality of the misstatement about the payment terms.[21] In light of that vacuum, we cannot conclude that an average investor would have viewed the difference between Hartcourt potentially selling shares for a definite payment of $1.25 million in cash rather than definitely selling the shares in exchange for a promissory note of $1.25 million as pertinent in evaluating the company. We would have to engage in rank speculation to determine the

[21]The SEC submitted a declaration from a financial professional about the effect of a series of allegedly fraudulent press releases on Hartcourt's stock price in order to prove the materiality of those misstatements. As noted, the SEC no longer argues Phan committed fraud by issuing those press releases.

inference that investors would have drawn from knowing that the transaction changed from a potential occurrence to a definite reality. But as the Supreme Court has observed, "[t]he determination [of materiality] requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts." *Id.*

We do agree with the SEC's observation in its brief that "[a]ny reasonable investor would consider it important that the company was giving away one million shares and getting . . . *nothing close* to full payment for the shares," (emphasis added); *see also Murphy*, 626 F.2d at 653 ("Surely the materiality of information relating to financial condition . . . is not subject to serious challenge."). But we must accept for present purposes that Hartcourt received a $1.25 million promissory note in exchange for the shares. Although financial logic dictates that a $1.25 million promissory note is less valuable than $1.25 million in cash, given the risks inherent in a loan and the time value of money, the record contains no evidence about the value of this $1.25 million note at the time the transaction was restructured. Therefore, we have no way to know if Hartcourt's decision to accept a loan as payment was the equivalent of agreeing to get "*nothing close* to full payment for the shares," or represented only a minor decrease in payment that might well be an inconsequential change in the risk that investors already realized they faced by investing in the unproven company. Accordingly, we cannot say as a matter of law, unaided by any evidence in the record, that an investor would view the "total mix" of information about Hartcourt as "significantly altered" by this misstatement, standing alone. *See Basic*, 485 U.S. at 231-32; *United States v. Bingham*, 992 F.2d 975, 976 (9th Cir. 1993) (per curiam) (reversing a criminal conviction for violating Rule 10b-5 when the government's expert testimony about materiality was "far too abstract to satisfy the materiality requirement in a particular case," because "[m]ateriality must be judged in the context of the 'total mix' of information available to investors").

Indeed, the case for materiality is, if anything, weaker here than it was in *TSC Indus.* In *TSC Indus*., the Supreme Court refused to hold as a matter of law that the difference in value of a payment in warrants worth $3.50 and warrants worth $5.25 was material. Here, we do not even know the value of the promissory note. Given that gap in the record — which would turn on Wu's financial circumstances, her credit record, and the likely repayment schedule, among other things — we cannot gauge the extent of the misrepresentation and so cannot determine whether the difference in value between the promissory note and $1.25 million in cash was greater, absolutely or as a percentage of the represented value, than the difference in value in *TSC Indus*., the significance of which was held to be a question for the trier of fact.

The SEC, indeed, does not really argue that the materiality of the *one* misstatement about payment terms — the only misstatement supported by the record when construed in the light most favorable to Phan — was by itself sufficiently obvious to warrant summary judgment. Instead, the SEC's brief argues only that importance of the "*numerous* misrepresentations and omissions is 'so obvious that reasonable minds could not differ,' " not that the single misstatement regarding the form of the transaction meets that standard. (Emphasis added). Likewise, the single judicial opinion that the SEC cites to support granting summary judgment on materiality, *SEC v. Softpoint, Inc.*, 958 F. Supp. 846 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 1348 (2d Cir. 1998) (unpublished table decision), concerns no misstatement similar to the sole misstatement we may consider at this juncture. True, in that case, the defendant's "Form S-8 registrations misrepresented the stock issued . . . as a consultant's fee, when, in actuality, proceeds from the shares were funnelled back to [the company]." *Id.* at 863. But, as we have stressed, the record here, construed in the light most favorable to the defendants, demonstrates that the stock was initially issued to Wu as a consultant's fee. No case, including *Soft-*

*point*, supports the conclusion that a single misstatement on a somewhat peripheral aspect of a transaction is material.[22]

In sum, whether Phan made a material misstatement of fact in the original filing is a question for resolution at trial. Although it may well be that, in fact, the transaction was a capital-raising conduit from the outset and the contrary representations on the S-8 form were material misstatements, or that the admitted misstatements regarding the form of the original transaction was indeed material, neither matter can appropriately be decided on the present summary judgment record.

## IV.

Up to this point our analysis has assumed that we can consider all the evidence the district court used in ruling on the summary judgment motions. Phan also appeals, however, the district court's rejection of several evidentiary objections.

In asking us to reverse the district court's evidentiary rulings Phan faces a heavy burden. A district court's refusal to exclude evidence in its consideration of summary judgment is

[22]Aside from alleging that the S-8 form contained material misstatements at the time it was filed, the SEC also makes a cursory argument that Phan violated "general antifraud principles" (but no regulatory requirement) by failing to update the form to disclose the later capital-raising resales. On this theory, Phan would be liable for securities fraud based on the resale of Wu's stock, notwithstanding the disputed record concerning whether Phan intended her to be a capital-raising conduit when the S-8 form was filed.

This argument, however, cannot be reconciled with our holding in the opinion's previous section that Phan violated Section 5 of the 1933 Act by failing to file a *new* registration form at the time of Wu's resales, because the S-8 form was no longer effective. We do not understand how the securities laws could simultaneously deem the S-8 form ineffective *and* require Phan to update the form, and we have found no case law applying a duty to update to a stock registration form when the registrant is not still issuing stock pursuant to that form.

reviewed for an abuse of discretion and warrants reversal only when the "evidentiary ruling was manifestly erroneous *and* prejudicial." *Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir. 2002). Phan falls far short of meeting such a burden. His arguments are meritless, and some border on frivolous.

Phan's broadest challenge concerns a declaration submitted by SEC lawyer Nicholas Chung, which incorporated dozens of interview transcripts, depositions, and documentary exhibits. Phan argues the declaration and its attachments must be excluded because Chung neither had personal knowledge of the attachments' creation nor served as a record custodian at the SEC. Excluding this declaration would leave no evidence in the record supporting the SEC's claims.

Phan correctly notes that Rule 56(e) of the Federal Rules of Civil Procedure requires that declarations used to support or oppose summary judgment motions "shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the [declarant] is competent to testify to the matters stated therein." FED. R. CIV. P. 56(e). For summary judgment declarations, however, "a proper foundation need not be established through personal knowledge but can rest on any manner permitted by Federal Rule of Evidence 901(b) or 902." *Orr*, 285 F.3d at 774. With the exception of one transcript, discussed below, Phan presents no argument on appeal that the documents attached to Chung's declaration failed to comply with Rules 901 and 902.[23]

Phan does argue that the SEC failed to establish a sufficient foundation for the transcript of Yang's August 2001 interview, conducted as part of a SEC investigation into a prior case. That transcript lacked a court reporter's certification when originally submitted to the district court, but the SEC

[23]Moreover, the district court thoroughly reviewed each attachment for compliance with Rules 901 and 902 and excluded several it found to lack the proper foundation.

later provided the certification by filing a declaration from the court reporter. The later declaration was adequate. *See* FED. R. CIV. P. 56(e) ("The court may permit affidavits to be supplemented . . . by . . . further affidavits.").[24]

Phan also objects to the admission of the transcript of Yang's 2001 interview because neither Phan nor his lawyer was given an opportunity to attend it. Accordingly, Phan argues, the transcript's use violated the requirement in the Federal Rules of Civil Procedure that depositions may be used only "against any party who was present or represented at the taking of the deposition." FED. R. CIV. P. 32(a). An interview given under penalty of perjury may, however, be treated as a declaration — and therefore may be considered in ruling on a summary judgment motion, FED. R. CIV. P. 56(e) — even though Rule 32(a) prevents its use as a formal deposition. *Hoover v. Switlik Parachute Co.*, 663 F.2d 964, 966 (9th Cir. 1981); *see also SEC v. Am. Commodity Exch., Inc.*, 546 F.2d 1361, 1369 (10th Cir. 1976) (holding that transcripts from a SEC investigation may be considered in ruling on summary judgment as the equivalent to a declaration).

## V.

**[15]** Fully accepting Phan's position that Wu received one million shares of Hartcourt in exchange for a $1.25 million loan to compensate Yang's service as a consultant and resold most of those shares to repay the loan, Phan is nonetheless liable under Section 5 for the unregistered resale of Hartcourt's stock. The district court therefore correctly granted summary judgment in favor of the SEC on the Section 5 cause of action. But the fact that this transaction differed from the

[24]The district court did not err in admitting the transcript even if Phan is correct that the certification erred by two or four pages in listing the transcript's length. This discrepancy by itself does not raise a significant doubt concerning whether the transcript "is what its proponent claims." FED. R. EVID. 901(a).

arrangement Hartcourt detailed in registering those one million shares with the SEC does not establish as a matter of law — although it raises the distinct possibility — that Phan committed securities fraud by making a material misstatement. We therefore reverse the grant of summary judgment in favor of the SEC on these claims but affirm the denial of Phan's motion for summary judgment. Because the district court's award of penalties and injunctive relief against Phan was partly based on the determination that he violated the antifraud provisions, we also vacate that award except for the permanent injunction prohibiting Phan from violating Section 5.

**AFFIRMED in part; REVERSED in part; VACATED in part. REMANDED for further proceedings consistent with this opinion.** Each party shall bear its own cost on appeal.